# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00703-CR

**Jesse Williams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 3021005, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Jesse Williams guilty of intentionally causing serious bodily injury to a child and assessed his punishment at life in prison and a $10,000 fine. *See* Tex. Penal Code Ann. § 22.04(a)(1), (e) (West Supp. 2007). In two issues on appeal, appellant contends that the trial court erred by overruling his motion to suppress two videotaped statements he made to the police. Finding no reversible error, we affirm the trial court's judgment.

## BACKGROUND

**The Events**

On May 14, 2002, firefighters responded to a 911 call placed by appellant asking them to come to the aid of an unconscious child. The firefighters found appellant and his mother standing on a street corner. The woman was holding an unconscious infant, later identified as two-and-a-half-year-old D.B., the son of appellant's girlfriend, Eugenie Rochelle Bradshaw. When the

firefighters arrived, D.B. was limp and unresponsive to stimuli, including pain. It was immediately apparent to them that something was seriously wrong with the child neurologically. They also saw both recent and older scabs on the boy's chest and what appeared to be deep scratches all over his body.

The firefighters asked appellant what had happened to the child. Appellant said that "this is probably going to be my fault." His mother asked, "What did you do?" Appellant said that D.B. had had a bowel movement in his pants and so he punished him. As the firefighters worked to revive the child, appellant, who smelled strongly of alcohol, "stood around" looking nervous.

Appellant was also questioned at the scene by Police Officer Carlos Vallejo.[1] Appellant told Vallejo that D.B. had been disobedient, so he grabbed him by the arm and spanked him three or four times using the palm of his right hand. Appellant told the officer that D.B. had broken into a "cold sweat" and that he thought he might have given D.B. a "rude awakening."

As the EMS technicians were putting D.B. into the ambulance, his body began "posturing," an indication that his brain was starting to swell. At the hospital, doctors discovered bleeding and swelling throughout the child's brain and indications that he had been violently shaken. He had suffered renal failure. His buttocks were badly bruised and swollen from being beaten with some sort of blunt object. It appeared that the child had been beaten, shaken, and then "left for dead." D.B. survived, but he is disabled for life.

---

[1] Appellant does not question the admissibility of his statements to Vallejo.

2

**The Interviews**

The following day, May 15, Detective Robert Merrill interviewed appellant in an interview room at the police station. Appellant was brought to the station in handcuffs, but he was not cuffed or restrained during the interview.[2] At the beginning of the interview, Merrill advised appellant of his *Miranda* rights, and appellant said that he understood. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The interview continued as follows:

> Q. Do you have any questions about those rights?
>
> A. I want to terminate everything right now.
>
> Q. You want to terminate . . .
>
> A. You're telling me that I'm under arrest.
>
> Q. No, you're not.
>
> A. (Inaudible).
>
> Q. They—they cuffed you up.
>
> A. Yes, they did. They claim I was being detained.
>
> Q. Right. And I'm gonna protect me and you. Now, you know your rights. You—you don't have to talk to me if you don't want to.
>
> A. That's the only reason why I came down here was to comply with—with whatever his name was, the other detective.
>
> Q. Detective Faithful?

---

[2] The State initially stipulated at the pretrial hearing that appellant was in custody. The State later argued that appellant was not in custody because the handcuffs were removed and appellant was told that he was not under arrest.

A.    Uh-huh.

Q.    Okay. We would like to have an idea so we can tell the doctor what happened, give him an idea of how to treat your boy, but that's your decision to make. You said you want to terminate it. Do you want to terminate or do you want to talk to me?

A.    No, I want to help to comply—to help—to help my son, uhh—

Q.    To help your son?

A.    Yes, I do.

Without further hesitation, appellant began to answer Merrill's questions. Appellant talked about the days before the 911 call in great detail, describing how he had cared for D.B., where he went with him, what D.B. did and ate, D.B.'s general health, and who else cared for him. Appellant also described some of his disciplinary measures, including a brief spanking on the night of the 911 call, after which D.B. fell and hit his head on the floor. Appellant said that he spanked D.B. no more than once per day. Often, he would put D.B. in a particular position with his hands on the ground or have him stand in the corner with his hands up for time out, instead of spanking him. Appellant denied pushing D.B. or doing anything that could cause a brain injury. Appellant admitted having about three beers on the night he called 911. He said he was not drunk and had not smoked any marihuana. Appellant emphasized that D.B. had suffered numerous falls: backwards onto the floor, off of the front porch steps, at the gym, in the bathtub, and from a swing.

Appellant was allowed to leave the police station after the May 15 interview, and a police officer gave him a ride to the hospital. Appellant was arrested for injury to a child with serious bodily injury two days later, on May 17. After his arrest, he was interviewed by Merrill

a second time. He was again advised of his rights and agreed to waive those rights. In this May 17 interview, appellant initially stated that he used only periodic spankings and time-outs in certain positions to discipline the child. As the interview continued, appellant admitted shaking D.B. on two separate occasions, once on the night of the 911 phone call and once a week before that call. He said that when he shook D.B., the child's head swung all the way back and all the way forward. Appellant said that he knew he "went overboard" but that he was not trying to injure D.B., only to rear him properly.

On May 18, appellant called the police station from jail wanting to speak to Merrill. Merrill returned appellant's call and, without appellant's knowledge, recorded the conversation. Appellant told Merrill that on the night the boy was injured, he "may have went a little bit overboard." He explained that he had been smoking marihuana that may have been laced with PCP and may have consumed three or more beers.

**The Pretrial Hearing**

Following a hearing, the trial court overruled appellant's motion to suppress the videotapes and transcripts of the May 15 and May 17 interviews. With respect to the May 15 interview, the court determined that appellant's statement that he wanted to "terminate everything right now," considered in the context of the total conversation and appellant's demeanor as shown on the videotape, did not amount to an unambiguous assertion of his right to terminate the interview. The court said:

> The court finds that after reading all of the transcript and watching the video
> that the defendant did not unambiguously assert his right to terminate the interview,

5

and I made this determination by considering the conversation between the defendant and the Detective Merrill . . . . And it's clear to this court that the defendant was attempting to clarify what Detective Merrill meant and that was, he was trying to clarify whether he was in custody . . . .

Also considering the entire conversation, it's clear that Detective Merrill never uses coercion or tries to—he tries to clarify for the defendant to see if he is actually terminating everything. He's trying to clarify whether he's in custody. And you have to take in the totality of the conversation and also the tape and the demeanor of the witnesses.

I do understand that just on its face from what the defendant says, "I want to terminate everything," it seems like it's clear. However, if you look at the entire interaction between the two, it's clear that the defendant was confused and that Detective Merrill was trying to clarify and get an unambiguous statement from the defendant about what he wanted to do.

The court concluded that the May 15 statement was the product of custodial interrogation, but that appellant had been properly advised of his rights and had voluntarily waived those rights and spoken to the detective in full compliance with article 38.22. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005).

The court also found that the May 17 statement was made during custodial interrogation, but again concluded that appellant knowingly waived his rights and gave the statement voluntarily. The court did suppress large portions of appellant's May 18 telephone conversation with Merrill, finding that the statements were in response to interrogation and that appellant had not been advised of his *Miranda* rights that day. The court ruled that the statement about the PCP-laced marihuana was admissible, however, because it was made spontaneously and not in response to questions by the officer.[3]

---

[3] Appellant does not challenge the court's ruling regarding the telephone conversation.

6

**The Trial**

The jury heard the police and medical testimony summarized above. Consistent with the trial court's ruling, the jury also saw and heard appellant's May 15 and May 17 statements, and heard the admissible portions of the May 18 telephone call.

D.B.'s mother, Eugenie Rochelle Bradshaw, testified that she had known appellant for several years, and that they had had an "off-and-on relationship." In January 2002, appellant moved into the apartment that Bradshaw and D.B. shared with one of her relatives. During this time, appellant cared for D.B. while Bradshaw worked. Around May 1, Bradshaw and D.B. left the apartment and moved in with a friend, while appellant moved in with his mother. Appellant continued to care for D.B. In fact, D.B. was essentially living with appellant and his mother, and Bradshaw would visit with him for an hour or so every other day. Bradshaw testified that appellant was responsible for feeding, dressing, and bathing D.B. She said that prior to May 14, she never saw appellant impose any excessive physical discipline, and that she did not observe any physical or cognitive injuries to D.B. prior to May 14.

Appellant testified in his own defense. He said that he was not an experienced parent and that he disciplined D.B. by spanking him approximately once a day. He also made D.B. stand in a corner with his hands up or forced him to stand in a "V" position with his hands on the floor. He twice disciplined D.B. by shaking him. Appellant said he did not know that shaking a child could cause serious bodily harm and that he would not have done so had he known. He recounted several accidental injuries to D.B.'s head, including falls from a swing, a step, in a bathtub, at the gym, and against the couch.

7

On cross-examination, appellant testified that he was upset on the night he called 911 because D.B. had a dirty diaper, refused to bring appellant a candy bar, and refused to go to bed. He admitted spanking the boy repeatedly on top of his swollen, bruised bottom and demonstrated how he shook the boy for 30 to 45 seconds. Appellant acknowledged that he shook D.B. until the child became unconscious and started gasping for air.

Throughout his testimony, appellant insisted that he did not intentionally or knowingly injure D.B. Appellant told the jury, "I admit I made a mistake. . . . And the only thing I can honestly say is, I apologize to the mother for trying to rear him the best way I can. I had limited knowledge. I'm not the smartest person in the world. . . I did my best."

In his closing argument, appellant's counsel did not seek to persuade the jury that appellant had not injured D.B. Instead, he stressed that appellant had not intended to injure the child and did not know that his actions would cause such injury.

> This is what he's culpable and responsible for. Accepting care of a child, an infant child when he shouldn't have, when he wasn't a parent, when he'd never done any babysitting, when he had never done any parent training.
>
> . . .
>
> He had so little experience that when the child exhibited cognitive or motor deficits, he didn't even recognize them. Doesn't even—it's below knowing. He doesn't even know. He's doesn't know, in the words of government's lawyers, until it's almost too late. And then it took the intervention of his mother to say, what on earth has happened? How could this be? He says, I don't know. I'm just doing the best I can.
>
> Remember, he didn't say, I intended to hurt the child, or I knew I was going to hurt the child. He said, I did the best I can, and I made a mistake and I caused accidents.

. . .

We also believe that there are certain physical acts, occurrences and events that contributed to the injuries. We clearly believe falling contributed. We clearly believe being ejected from a swing contributed. We clearly believe slipping in the bathtub contributed. Falling on the bleachers contributed. All of these acts and occurrences contributed. Shaking, spanking. We agree to all of that. It's self-evident and obvious. No doubt about it.

But then the question then occurs, during the course of the spank or the shake or the push or the pull, was it your conscious objective and desire, was it your intent to cause the result? When you—when you do the swat, is it your conscious intent and desire to cause these kinds of injuries, or are you aware that this—or this is going to cause these kinds of injuries? We think the answer is simple.

And we think you'd best refer to Detective Merrill and Jesse Williams himself. Both say accident, mistake. I didn't think you meant to do it. I didn't mean to do it. I confess a mistake.

## DISCUSSION

In his first issue on appeal, appellant contends that his Fifth Amendment rights were violated on May 15 when Merrill continued to question him after he attempted to terminate the interview. In his second issue, appellant asserts that the unlawful May 15 interview tainted the interview on May 17. He urges that the trial court erred by admitting the two statements.

**Standard of Review**

An appellate court should afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Hollingsworth v. State*, 15 S.W.3d 586, 591 (Tex. App.—Austin 2000, no pet.). Appellate courts should give the same amount of deference to a trial court's rulings on "application of law to

9

fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89; *Hargrove v. State*, 162 S.W.3d 313, 318 (Tex. App.—Fort Worth 2005, pet. ref'd). Appellate courts review de novo "mixed questions of law and fact" not falling within this category. *Guzman*, 955 S.W.2d at 89; *Hargrove*, 162 S.W.3d at 318. At the hearing on a motion to suppress, the trial court is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Ramirez*, 44 S.W.3d at 109. The trial judge may choose to believe or disbelieve any or all of a witness's testimony. *Id*.

**Right to Terminate Questioning**

The right to terminate questioning is among the procedural safeguards that *Miranda* establishes. *Miranda*, 384 U.S. at 474. This right, which safeguards the Fifth Amendment right to remain silent, requires the police to immediately cease custodial interrogation when a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (quoting *Miranda*, 384 U.S. at 473-74). There is no talismanic word or phrase with which to invoke the right to remain silent. *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). Any declaration of a desire to terminate the contact or inquiry should suffice. *Ramos*, 245 S.W.3d at 418. The suspect need not object to further questioning in order to protect the right to remain silent. *Watson*, 762 S.W.2d at 599.

The threshold question is whether the suspect invoked his right to silence. *Ramirez v. State*, 44 S.W.3d 107, 110 (Tex. App.—Austin 2001, no pet.). An interrogating officer need not stop his questioning unless the suspect's invocation of rights is unambiguous. *Ramos*, 245 S.W.3d

10

at 418; *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). A police officer does not violate a suspect's right to remain silent when he attempts to clarify whether the suspect wishes to remain silent, and the suspect may thereafter choose to continue to speak about the offense. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003); *Barnes v. Johnson*, 160 F.3d 218, 224-25 (5th Cir. 1998) (officer did not violate defendant's right to silence when he attempted to clarify whether defendant wished to invoke right with "a few explanatory, noncoercive questions," and defendant chose to keep talking). In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Watson*, 762 S.W.2d at 597. Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances. *See Douthitt*, 931 S.W.2d at 257 (holding that suspect's statement, "I can't say more than that. I need to rest," was ambiguous and indicated only that suspect believed that he was physically unable to continue); *Franks v. State*, 90 S.W.3d 771, 787 (Tex. App.—Fort Worth 2002, pet. ref'd, untimely filed) (suspect's statement that he was tired and did not want to talk anymore was ambiguous and merely indicated that suspect was physically unable to continue).

**The May 15 Statement**

In *Hargrove*, the suspect was being questioned when he said, "Let's just terminate it." 162 S.W.3d at 319. The interrogating officer asked, "Do you want to stop now?" and the suspect replied, "Why should we go on because I'll be spinning my wheels. You're spinning your wheels." *Id*. However, the suspect never answered the officer's question about whether he wanted to stop, continued speaking without clarifying his remark, and never again asked to end the

11

interview. *Id*. The court held that the suspect's "terminate it" comment was ambiguous and that his rights were not violated by the continuation of the interrogation. *Id*. at 319-20.

The videotape of appellant's May 15 interview shows that appellant was left alone in the interrogation room after being brought to the station. After a period of silence, he began railing against the police in a long string of obscenities and said, "Least you all can talk to me or let me go, arrest me or something. . . . Talk to somebody." Merrill reentered the room and appellant said, "I'm trying to see if I'm getting talked to or what. Yeah, I'm trying to see how my boy's doing. *You guys need to talk to me, arrest me or whatever . . . .*" (Emphasis added.) Merrill asked appellant for his name and inquired how he was doing. Appellant complained about having been in handcuffs but said that he was fine. Merrill then advised appellant of his rights and asked if he had any questions. As noted previously, appellant responded "I want to terminate everything right now." When Merrill asked appellant to confirm that he "want[ed] to terminate," appellant interrupted to say, "You're telling me that I'm under arrest." At this point, it was reasonable for the officer to believe that appellant's main concern was that he was under arrest. After a brief discussion of appellant's arrest status, Merrill said, "Now you know your rights. You—you don't have to talk to me if you don't want to." When appellant said that he came to the police station to "comply with" the other detective, Merrill repeated that it was up to appellant and again asked if appellant wanted to terminate the interview. Appellant said he wanted to help his son and the interview continued. The officer did not threaten, badger, or coerce appellant. Appellant displayed no reluctance to answer the officer's questions.

12

When appellant told Merrill that he wanted to "terminate everything," the officer did not simply ignore the statement and continue questioning. Instead, the officer sought to clarify appellant's wishes before continuing the interview. *See Marshall v. State*, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006) (federal constitutional law does not prohibit officer from clarifying whether arrestee wished to waive right to remain silent). After viewing the videotape, we agree with the trial court's conclusion that appellant's statement that he wanted to "terminate everything," when considered in the context in which it was made—which includes appellant's statement moments earlier that "[y]ou guys need to talk to me, arrest me or whatever"—did not constitute an unambiguous invocation of the right to silence. Rather, appellant appeared frustrated by his detention and was attempting to determine whether he had been arrested. Giving due deference to the fact finder's credibility determinations, we conclude that the court did not abuse its discretion by overruling the motion to suppress and admitting the May 15 interview into evidence.[4] *See Ramirez*, 44 S.W.3d at 109.

The concurring opinion argues that it is inappropriate to consider the context in which appellant's statement was made, urging that such an approach is contrary to the holding in *Ramos*. In *Ramos*, the suspect told the interrogating officer that "he didn't want to talk to [the officer]. That he didn't want to talk about it anymore." 245 S.W.3d at 413. The court of criminal appeals held:

---

[4] *See Milburn v. State*, No. 03-02-00458-CR, 2004 Tex. App. LEXIS 1057, at *12-14 (Tex. App.—Austin Feb. 5, 2004, pet. ref'd) (mem. op.) (not designated for publication) (cited for illustrative purposes only) (suspect said "I don't have nothing to say," officer responded by repeating suspect's statement in the form of a question; officer's action was not calculated to elicit an incriminating response; suspect's subsequent admission manifested a desire to continue the conversation and did not unambiguously invoke the right to silence).

[Ramos's] statement to [the officer] that he did not want to talk to him was an unambiguous, unequivocal, and unqualified assertion of the right to remain silent. A reasonable police officer in [the officer's] position would not have found [Ramos's] assertion of his right to be ambiguous. Any ambiguity in [Ramos's] other statement to [the officer], that he did not want to talk about "it" anymore, was, *in context*, entirely irrelevant.

*Id*. at 418-19 (citation omitted and emphasis added). Contrary to the argument in the concurring opinion, the court of criminal appeals in *Ramos* considered the context in which the critical statements were made. What distinguishes *Ramos* from this case is that Ramos's statement, "I don't want to talk to you," is clearer and less ambiguous than appellant's statement, "I want to terminate everything right now." We do not believe that *Ramos* prohibits the trial court or this Court from considering the context in order to ascertain appellant's meaning.

We further conclude, for reasons we will discuss below, that if appellant's statement that he wanted to "terminate everything right now" was under the circumstances an unambiguous request to remain silent, and if Merrill failed to scrupulously honor that request by continuing to question appellant, and if the trial court erred by admitting the May 15 videotaped interview into evidence, the error was harmless. In order to explain this alternative holding, we must first discuss appellant's challenge to the admission of the May 17 videotaped interview.

**The May 17 Statement**

In his second issue, appellant contends that his May 17 statement to the police was erroneously admitted because it was "tainted" by the May 15 statement. It is unclear from his brief whether appellant is asserting that: (1) because he invoked his right to remain silent on May 15, the

14

police could not interview him on May 17, or (2) the May 17 statement was the tainted fruit of the inadmissible May 15 statement.

Appellant relies primarily on the holding in *Michigan v. Mosley*, 423 U.S. 96 (1975). Mosley was arrested in connection with a series of robberies, taken to a police interrogation room, and advised of his *Miranda* rights. *Id*. at 97. After Mosley said that he did not want to answer any questions about the robberies, the arresting officer immediately ended the interrogation, and Mosley was taken to a jail cell. *Id*. More than two hours later, Mosley was taken from his cell to another interrogation room, where a different officer advised him of his rights and began to question him about a homicide unrelated to the offenses for which he had been arrested. *Id*. at 98. Mosley did not invoke his right to remain silent, did not ask for counsel, and gave a statement implicating himself in the homicide. *Id*. It was undisputed that the later interrogation fully complied with *Miranda* procedures when considered alone, but Mosley urged that it was impermissible for the second officer to question him about the homicide after he had told the first officer that he did not want to talk about the robberies. *Id*. at 98-99.

The *Mosley* Court rejected any reading of *Miranda* under which a person who has invoked his right to silence can never again be subjected to custodial interrogation. *Id*. at 101-02. Instead, the admissibility of statements obtained after a person in custody has decided to remain silent depends on whether the right to cut off questioning was scrupulously honored. *Id*. at 104. The Court concluded that Mosley's right to cut off questioning had been fully respected: "[T]he police here immediately ceased the [first] interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second

15

interrogation to a crime that had not been a subject of the earlier interrogation." *Id*. at 106. Under *Mosley*, courts must evaluate the facts of each case to determine if the resumption of police interrogation was consistent with scrupulous observance of the right to cut off questioning. *Maestas v. State*, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999).

For the purposes of our discussion of appellant's second issue, we will assume that Merrill failed to scrupulously honor appellant's right to remain silent by continuing to question him on May 15 after appellant said he wanted to "terminate everything." We do not believe, however, that *Mosley* compels the conclusion that Merrill was precluded from approaching appellant on May 17 and obtaining an admissible statement. After the May 15 interview ended, appellant was released from custody and allowed to go home. Appellant remained at large for two days, until he was arrested for this offense on May 17. Before interviewing appellant on May 17, Merrill advised him of his rights and appellant voluntarily waived those rights. Considered alone, the May 17 interview fully complied with *Miranda* procedures. In light of the two-day period during which appellant was not in custody, we hold that appellant's invocation of the right to silence on May 15 did not carry over to the May 17 interview so as to render invalid appellant's waiver of the right to silence on the latter date.

Making a confession under circumstances that preclude its use does not perpetually disable the confessor from making a usable one after those circumstances have been removed. *Griffin v. State*, 765 S.W.2d 422, 428 (Tex. Crim. App. 1989) (quoting *United States v. Bayer*, 331 U.S. 532, 541 (1947)). It has never been held that the psychological impact of the voluntary disclosure of a guilty secret qualifies as State compulsion or compromises the voluntariness of a

16

subsequent informed waiver of the right to remain silent. *Id*. at 429 (quoting *Oregon v. Elstad*, 470 U.S. 298, 312 (1985)). When a person voluntarily makes an inculpatory statement under circumstances that render it inadmissible under *Miranda*, the dictates of *Miranda* and the goals of the Fifth Amendment are fully satisfied by barring the use of the statement. *Elstad*, 470 U.S. at 318. No further purpose is served by imputing "taint" to a subsequent statement obtained pursuant to a voluntary and knowing waiver of the person's *Miranda* rights. *Id*.

The trial court found that appellant's May 15 and May 17 statements were given voluntarily, and appellant does not dispute this. As we have already noted, the May 17 statement was taken in full conformity to *Miranda*'s dictates. We hold that even if the May 15 statement was inadmissible because appellant had invoked his right to remain silent, it did not taint the May 17 statement or otherwise render the May 17 statement inadmissible.

**Harmless Error**

We now turn to the question of whether, assuming the trial court erred by admitting the May 15 statement into evidence, the error was reversibly harmful. We conclude that it was not.

Appellant's trial testimony largely replicated the statements he made during the May 15 interview. Although appellant testified that the child accidentally fell and hit his head on a number of occasions, appellant did not deny striking and shaking D.B. during the days immediately preceding the emergency call. In fact, appellant admitted that on May 14, he had shaken D.B. until the child became unconscious and started gasping for air. Appellant's defense was not that he did not injure D.B., but that he did not intentionally or knowingly injure the child.

17

It cannot be persuasively argued that, but for the admission of the May 15 statement, appellant would have chosen a different defensive strategy. Even if the May 15 statement had not been admitted in evidence, the jury would have heard the testimony that when emergency workers found appellant with the child on May 14, he told them "this is probably going to be my fault." Appellant also said at the scene that he had grabbed D.B. and spanked him, and that this might have been a "rude awakening." The jury would also have heard appellant's May 17 videotaped statement, which was properly admitted in evidence. During this interview, appellant admitted that he twice shook D.B., once on the night of the emergency, that the child's head swung back and forth when he shook him, and that he knew that he "went overboard." The jury would also have heard portions of appellant's May 18 telephone call to Merrill, during which appellant admitted that he went "overboard" when he disciplined D.B. and that he had been smoking PCP-laced marihuana. Under the circumstances, it is likely that appellant's trial strategy would have been the same even if the court had suppressed the May 15 statement.

In short, there was considerable evidence of appellant's guilt even without the May 15 statement. *See Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002) (evidence of defendant's guilt is factor to consider in harm analysis). In light of the record as a whole, we conclude beyond a reasonable doubt that the admission of the May 15 statement, if error, did not contribute to the conviction or the punishment. *See* Tex. R. App. P. 44.2(a).

18

## CONCLUSION

For all the reasons stated, we hold that the trial court did not err, or did not reversibly err, by admitting into evidence appellant's May 15 and May 17 statements. We overrule issues one and two, and we affirm the judgment of conviction.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear;
   Concurring Opinion by Justice Puryear

Affirmed

Filed:  June 6, 2008

Publish

19