

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00009-CR
_____

DAMIEN O'KEITH LAWSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2021F00028

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

In Cass County, Texas, Damien O'Keith Lawson was indicted for continuous sexual abuse of a young child.[1]  After the trial court denied Lawson's motion to suppress a recording of his custodial confession, Lawson entered a plea of guilty, waived his right to a jury trial on guilt/innocence, and elected to have a jury determine punishment.  In accordance with the jury's recommendation, the trial court sentenced Lawson to ninety-nine years in the Texas Department of Criminal Justice.

On appeal, Lawson contends (1) that the trial court erred by admitting statements made during his custodial interview because he invoked his right to terminate the interview and (2) that his trial counsel was ineffective for advising him to plead guilty.

We affirm the trial court's judgment because (1) Lawson did not unambiguously invoke his right to terminate the interview and (2) the record is insufficient to show that Lawson's trial counsel was ineffective.

## I.    Factual and Procedural Background

On December 30, 2020, Daniel Britton, a state trooper with the Texas Department of Public Safety, was patrolling Club Lake Road in Linden, Cass County, Texas.  Britton saw a white passenger car in the ditch that had damage "on the front driver's side."  There was no one in the front seat, but the back windows were "foggy."  Because it had been raining and there was still water on the roads, Britton believed that the car might have been involved in a "crash or had slid off the road and was in the ditch there."  As he backed his car up to check on the vehicle, he

---

[1]*See* TEX. PENAL CODE ANN. § 21.02 (Supp.).

saw a black male, later identified as Damien Lawson, crawl out of the car's backseat into the front-seat area. The man "did not have any pants on." Britton also observed movement in the backseat area. Suspecting that "somebody was involved in a sexual act," Britton activated his car's overhead lights and got out of the vehicle to investigate the situation.

When Britton approached the car, he saw that Lawson was sitting in the car's front passenger seat, that he had put on some "light-colored pajama pants," and that he was sliding over into the driver's seat. Britton testified that it was obvious that the pants Lawson had put on did not belong to him because they were "very tight" and that Lawson obviously had an erection. Lawson rolled down his window and spoke with Britton, who radioed for assistance. Britton saw a young, black female in the backseat, and he asked for her age. She "immediately" replied that she was eighteen years old, but "almost without a beat," Lawson "shook his head and said, 'No, she's not eighteen.'"

Other troopers and deputies arrived and helped Britton sort out the situation. They were able to identify Lawson by his driver's license. The young female was identified as C.W.[2] Further questioning revealed that C.W. was twelve years old at the time of the stop.

Believing that Lawson and C.W. were having intercourse in the backseat of the car, Britton notified his superior officer, and he was put in touch with a criminal investigation division (CID). Due to the possibility of sexual assault, representatives from the CID contacted Joshua Mason, a Texas Ranger, who began an investigation. C.W.'s mother arrived at the scene,

---

[2]To protect the identity of the victim, who was a minor at the time of the alleged offense, we refer to her by initials. *See* TEX. R. APP. P. 9.10(a)(3).

and Britton made arrangements for professionals at the Texarkana Children's Advocacy Center (CAC) to forensically interview C.W.

Because Lawson had a "very strong odor of alcohol on his person" and he failed a field sobriety test, Britton arrested him and charged him with public intoxication. Mason asked Britton to "hold off" on charging Lawson with any sexually related charges until they had conducted a "full investigation." A recording from Britton's dash camera was admitted into evidence and played for the court.

Mason testified that he observed C.W.'s CAC forensic interview via closed circuit television. During the interview, C.W. made no outcry of sexual abuse. She was "very closed off," gave "limited information," and "did not disclose any sexual activity" with Lawson.

On December 31, 2020, just after midnight, Mason interrogated Lawson at the sheriff's office. Mason testified that Lawson was in custody at the time on charges of public intoxication. The interview was recorded, and it lasted "just a little over two hours." Lawson was cooperative during the interview and answered all of Mason's questions. During the interview, Lawson admitted that, in the car on the side of the road, on the day Britton arrested him, he had both sexual contact and sexual intercourse with C.W. Lawson also admitted that he had previously had sexual contact and sexual intercourse with C.W., claiming that the first instance of abuse had occurred more than eight months prior to the time of the interview. Over Lawson's objections, the recording of Lawson's interview was admitted into evidence and played for the court.

During the interview, Mason took a sample of Lawson's DNA by swabbing his cheek, and with consent, Mason also obtained a swab of Lawson's sexual organ. Mason submitted the

4

DNA evidence to the Texas Department of Public Safety crime laboratory in Garland. Testing showed that C.W.'s DNA was on Lawson's sexual organ, which corroborated some of Lawson's statements.

C.W. testified that she was thirteen years old at the time of trial. She testified that she lived with her mother and Lawson until the events of this case and that, at the time of trial, she and her siblings lived with their paternal grandmother. When she lived with her mother, they moved a lot. Lawson had lived with them since she was in the third or fourth grade.

The first time C.W. remembered Lawson ever being inappropriate with her happened when they lived with Lawson's mother, when C.W. was about ten years old. Several nights in a row, as she was trying to sleep, he rubbed on her "bottom," over her clothes. He did nothing to her brothers, who were sleeping nearby. A year or two later, after they had moved to Ellington Street, Lawson started "showing an interest" in C.W., and the sexual abuse began. She woke up one night, and Lawson had his finger inside her sexual organ. That was the first time Lawson sexually abused her. After that, it happened multiple times, and the events "all [ran] together" for C.W. The first time she had sexual intercourse with Lawson, she was in the fifth or sixth grade. Her mother had left for work, and C.W. was in her mother's bedroom when Lawson put his mouth on her sexual organ and then put his sexual organ inside hers. Lawson did not use a condom. After the first time, they "very rarely" had sex, but it "gradually" became an "every other week thing." The abuse continued for about two years until the events of this case, when she was in the seventh grade. C.W. testified that she had feelings for Lawson and that, at the time, she felt like she was in a relationship with him.

5

On the day Lawson was arrested, C.W. admitted that she was the one who raised the possibility of sex and that they were having sexual intercourse in the car when Britton arrived at the scene. She admitted that she lied to the officer about her age and lied during the CAC interview because she was trying to protect Lawson. She did not tell the CAC interviewer about having sex with Lawson, about him putting his finger in her sexual organ, or about the oral sex. C.W. testified that she did not "hate" Lawson but that her feelings for him were not the same as they were before Lawson's arrest. She did not believe that this was "a big situation," as she "was willing to do most of it."

Carly Frix Rhye, an expert in the "counseling of victims of child sexual abuse, child development and memory processing, as well as grooming and aspects of trauma of victims of child sex abuse," testified that, for a period of time, C.W. was her counseling client. Rhye testified that C.W. minimized what happened to her and that she showed signs of traumatic stress. Rhye stated, "In some ways, [C.W.] believed that she deserved [the sexual abuse] and that it was going to happen no matter what." In Rhye's opinion, C.W. would need more counseling in the future.

Before trial, Lawson filed a motion to suppress the statements he made during the December 31, 2020, custodial interview by Mason.[3] After a January 3, 2022, hearing, the trial court denied Lawson's motion, explained its reasoning, and found that the statements made during Lawson's interview were admissible. On January 13, 2022, Lawson waived a jury trial on guilt/innocence, entered a guilty plea, and filed a "Felony Waivers, Judicial Confession, and

---

[3]The pleading was entitled Motion to Determine Admissibility of Statement.

6

Agreement." The trial court accepted Lawson's guilty plea, and the case proceeded to trial on punishment. At the conclusion of the trial, the jury recommended a sentence of ninety-nine years in prison, and the trial court sentenced Lawson accordingly.

## II. The Trial Court did not Err by Admitting Lawson's Statements

In his first point of error, Lawson contends that the trial court erred by denying his motion to suppress and admitting into evidence the statements he made during the custodial interview.[4] Lawson contends that Mason did not honor his requests to terminate the interview.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion and will not disturb that ruling so long as it is within the zone of reasonable disagreement. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011); *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Hutchison v. State*, 424 S.W.3d 164, 175 (Tex. App.—Texarkana 2014, no pet.). In reviewing such a ruling, we apply a bifurcated standard of review. *Wilson v. State*, 311 S.W.3d 452, 457–58 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

> We approach our review with two standards, "giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely on the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations."

---

[4]In this context, we use the term interrogation and interview interchangeably.

*Hutchison*, 424 S.W.3d at 175 (quoting *Martinez*, 348 S.W.3d at 922–23); *see State v. Johnston*, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011); *Wilson*, 311 S.W.3d at 458; *Carmouche*, 10 S.W.3d at 327.

### B.      Applicable Law

"Under both the Federal constitutional standard and the Texas Confession Statute, evidence obtained as a result of a custodial interview is inadmissible unless the State proves the officer gave proper warnings and shows an affirmative waiver of rights by the accused." *Hutchison*, 424 S.W.3d at 175 (footnotes omitted) (citing TEX. CODE CRIM. PROC. ANN. art. 38.22; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008)).[5]  "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . ." *Miranda*, 384 U.S. at 444.

Article 38.22 of the Texas Code of Criminal Procedure governs the admissibility, in a criminal proceeding, of statements made by a defendant during a custodial interview. TEX. CODE CRIM. PROC. ANN. art. 38.22.  Section 3 provides that an oral statement is admissible against a defendant in a criminal proceeding if, among other things, (1) the statement was electronically recorded, (2) the defendant was given the warnings set out in Section 2(a) before the statement was made and the warnings are included on the recording, and (3) the defendant "knowingly,

---

[5]The prosecution may not use statements stemming from the custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Alvarado v. State*, 853 S.W.2d 17, 20 (Tex. Crim. App. 1993).  In order for the *Miranda* safeguards to apply, there must be two showings:  (1) the suspect must have been "in custody," and (2) the police must have "interrogated" the suspect either by express questioning or its functional equivalent. *See Rhode Island v. Innis*, 446 U.S. 291, 300–02 (1980); *Jones v. State*, 795 S.W.2d 171, 174 (Tex. Crim. App. 1990).  Here, it is undisputed that the statements were made as the result of custodial interrogation.

intelligently, and voluntarily" waived the rights set out in the warnings. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3. "The warnings provided in Section 2(a) are virtually identical to the *Miranda* warnings, with one exception—the warning that an accused 'has the right to terminate the interview at any time' as set out in Section 2(a)(5) is not required by *Miranda*." *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (citations omitted); *see Wilkerson v. State*, 173 S.W.3d 521, 527 n.14 (Tex. Crim. App. 2005) (observing that Article 38.22 "requires a slightly more elaborate set of warnings than *Miranda*"). The right to terminate a custodial interrogation is a "critical safeguard" of the right to remain silent. *See Watson v. State*, 762 S.W.2d 591, 596 (Tex. Crim. App. 1988) (en banc) (citing *Michigan v. Mosley*, 423 U.S. 96, 103 (1975)).

No formal invocation of this right is necessary. *Id.* at 598. Anything said or done by the suspect that could reasonably be interpreted as a desire to invoke the right to terminate the interview or to remain silent should be sufficient to halt questioning. *Id.* Hence, if the suspect suggests "in any manner" that he invokes the right to terminate the interview or to remain silent, the interrogation must stop. *Miranda*, 384 U.S. at 473–74. But any indication that the suspect wishes to remain silent must be unambiguous, and interrogating officers need not clarify wishes that are ambiguous. *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). If the suspect's statement is not an unambiguous or unequivocal request to terminate the interrogation or to invoke the right to silence, then the officers have no obligation to stop questioning him. *Davis v. United States*, 512 U.S. 452, 461–62 (1994); *Ramos*, 245 S.W.3d at 418. An officer's failure to stop a custodial interview after an unambiguous invocation of the right to remain silent

9

renders any later-obtained statements inadmissible. *Id.* In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Williams v. State*, 257 S.W.3d 426, 433 (Tex. App.—Austin 2008, pet. ref'd). Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances. *Id.*

Texas courts have provided guidance to determine whether a suspect has invoked his right to terminate an interview. *See, e.g.*, *Dowthitt*, 931 S.W.2d at 257 (holding that suspect's statement, "I can't say more than that. I need to rest," was ambiguous and conveyed only that suspect believed he was physically unable to continue); *Franks v. State*, 90 S.W.3d 771, 787 (Tex. App.—Fort Worth 2002, no pet.) (concluding that suspect's statement that he was tired and did not want to talk anymore was ambiguous and merely signified that suspect was physically unable to continue); *Granberry v. State*, 745 S.W.2d 34, 37 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd) (determining the totality of the circumstances around the statement "I will terminate it now" did not invoke appellant's right to terminate the interview "because appellant indicated his approval to be questioned" by waiving his rights and answering the officer's questions); *Davis v. State*, No. 06-05-00222-CR, 2007 WL 858782, at *3 (Tex. App.—Texarkana Mar. 23, 2007, pet. ref'd) (mem. op., not designated for publication) (determining that statement "I really don't want to talk about it" was an ambiguous invocation of the right to remain silent or to terminate the interrogation);[6] *but see Ramos v. State*, 245 S.W.3d 410, 418–19

---

[6]"Although unpublished cases have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

(Tex. Crim. App. 2008) (holding that the statement "I don't want to talk to you. I don't want to talk about it anymore" was "an unambiguous, unequivocal, and unqualified assertion of his right to remain silent"); *Friend v. State*, 473 S.W.3d 470, 478–79 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (determining that the response "not saying" to inculpatory questions about alcohol consumption invoked appellant's Fifth Amendment right to terminate the interview); *Miller v. State*, No. 13-98-00149-CR, 2000 WL 34251150, at *2 (Tex. App.—Corpus Christi July 20, 2000, no pet.) (not designated for publication) (concluding appellant invoked Fifth Amendment right to remain silent when he refused to give breath sample, refused to sign written copy of the *Miranda* warning, and replied, "No" to officer's request to "answer some questions").

**C. Lawson Did Not Unambiguously Invoke His Right to Terminate the Interview**

Lawson contends that the trial court erred in admitting the statements he made during the custodial interview because he invoked his statutory right to terminate the interview on four different occasions during the two-hour interview. One instance occurred approximately four minutes and forty-four seconds into the interview when Lawson told Mason that he was willing to talk to him "to an extent." Lawson continued, "Talk about something, then I'm done talking. I just wanted to stretch my legs." That is not an unambiguous invocation of Lawson's right to terminate the interview. Rather, it was an admission that Lawson was willing to participate in the interview "to an extent."

Lawson also argues that he invoked his right to terminate at five minutes and twenty-two seconds into the interview. Mason explained, "[A]t any time you don't want to talk any more, all

11

you have to do is say, 'Hey man, I'm done.'" Lawson replied by parroting back "say I'm, I'm done" and by telling Mason that he had already participated in a police interview. Mason told him that he had some questions that had not yet been asked, and Lawson replied, "Oh, okay." Mason, again, told Lawson, "If I ask you something and you don't want to answer it, you ain't got to answer it. That's your right." Lawson nodded his head in the affirmative and said, "Gotcha." The following colloquy then occurred:

> Mason: Will you waive your rights and talk to me?

> Lawson: I will.

> Mason: . . . . Still knowing that at any time, you can say, "Hey man, I'm done," and I'll get you out of here . . . .

> Lawson: Okay. [Nods his head in the affirmative.]

Based on the totality of the circumstances here, we find that Lawson saying, "I'm done," in this instance, was not an invocation of his right to terminate the interview because he agreed to waive his rights and speak with Mason. We further find that his parroting response of "I'm done" could be reasonably interpreted as an acknowledgment that he understood how to end the interview. Therefore, he did not unambiguously invoke his right. *See Williams*, 257 S.W.3d at 433.

At approximately thirty-six minutes and fifty seconds into the interview, the following discussion occurred:

> Lawson: I'm good. I don't want to talk about that no more. I don't want to cry. I'm done talking.

> Mason: I understand. I understand. You're in a bad spot.

12

>Lawson: Yes, sir.

>Mason: The good thing is that you're trying to help yourself by being honest.

>Lawson: How am I going to help myself?

Lawson continued to speak, referencing a Bowie County homicide case where he lost "a homie" and stating, "I told my homie [involved in the Bowie County case] to tell the truth and here I am . . . . Why wouldn't I come in here and not say what I have to?" Mason then continued questioning Lawson about the events on the day he was arrested.

Viewed in a vacuum, Lawson's statement that he was "done talking" would appear to invoke his right to terminate the interview, particularly in light of Mason's instructions that, if he wanted to end the interview, all he had to say was "Hey man, I'm done." However, Lawson's statement must be viewed in light of the totality of the circumstances. *See Williams*, 257 S.W.3d at 433. Mason chose generalized language that Lawson could use to end the interview. After Lawson stated that was "done talking," he, unsolicited by a question from Mason, continued speaking, asking Mason questions and engaging in discussion with Mason. Moreover, Lawson even asked Mason, "Why wouldn't I come in here and not say what I have to?" possibly indicating that he wanted to continue the interview because he had more to say. By continuing to talk after he stated that he was done talking, Lawson rendered his statement ambiguous. *See Esquivel v. State*, No. 04-08-00730-CR, 2009 WL 3222626 (Tex. App.—San Antonio Oct. 7, 2009, no pet.) (mem. op., not designated for publication) (continuing to talk after saying that he was "done talking" rendered defendant's invocation ambiguous); *Davis*, 2007 WL 858782, at *3. Accordingly, Lawson did not unambiguously invoke his right to terminate the interview.

13

Finally, at about one hour and one minute into the interview, Lawson said, "I don't want to hear that. I'm ready to go. I'm ready to go. I don't want to cry. You get worse and worse the more you talk, man." Mason replied, "I know," and he resumed his questioning. Here, Lawson's statement is ambiguous because it is open to more than one interpretation. Lawson's repeated statement that he was ready to go could have meant that he wanted to terminate the interview, but it also could have meant that he wanted to continue the interview or change the subject of Mason's questions. Because there is more than one reasonable interpretation of Lawson's statements, he did not clearly invoke his right to terminate the interview. *See Williams*, 257 S.W.3d at 433.

Based on the foregoing, we find that Lawson did not unambiguously invoke his right to terminate the interview and that the trial court did not err by denying Lawson's motion to suppress or by admitting Lawson's statements into evidence. Accordingly, we overrule this point of error.

### III. Lawson's Trial Counsel Was Not Ineffective?

In his final point of error, Lawson argues that his trial counsel was ineffective for advising Lawson to plead guilty because it denied him "the ability to have the jury decide the voluntariness of [his] confession."

As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). In order to prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*. 466 U.S. 668, 687–88 (1984); *see also Ex parte Imoudu*,

14

284 S.W.3d 866, 869 (Tex. Crim. App. 2009). The first prong requires a showing that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "This measure of deference, however, must not be watered down into a disguised form of acquiescence." *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987) (finding ineffective assistance where counsel failed to request medical records and relied on court-appointed competency examination when he knew client had escaped from mental institution).

The second *Strickland* prong, sometimes referred to as "the prejudice prong," requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* Thus, in order to establish prejudice,

> an applicant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." [*Strickland*, 466 U.S.] at 687 . . . . It is not sufficient for Applicant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693 . . . . Rather, [he] must show that "there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt." *Id.* at 695 . . . .
>     . . . .
>     The applicant has the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Allegations of ineffectiveness must be based on the record, and the presumption of a sound trial strategy cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Busby v. State*, 990 S.W.2d 263, 269 (Tex. Crim. App. 1999). The reviewing court must look to the totality of the representation, and its decision must be based on the facts of the particular case, viewed at the time of counsel's conduct so as to eliminate hindsight bias. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. In all cases, the "ultimate focus of

15

> inquiry must be on the fundamental fairness of the proceeding." *Id.* at 696, 104 S.Ct. 2052.

*Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

A failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). The *Strickland* test "of necessity requires a case-by-case examination of the evidence." *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring in judgment)).

Lawson pled guilty at the guilt/innocence phase of the trial. Lawson contends that his "entry of a guilty plea . . . upon the advice of trial counsel was erroneous because the ineffective assistance of trial counsel denied [him] the ability to have the jury decide the issue of voluntariness of the [his] confession."[7]

Here, Lawson filed a verified motion for a new trial. However, his motion for a new trial failed to allege that his trial counsel was ineffective. Therefore, the record is silent as to why Lawson's trial counsel advised him to plead guilty. When an appellate record is silent on why trial counsel took or failed to take certain actions, the appellant has "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *see Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). This is because allegations of ineffectiveness "must 'be firmly founded in the record.'" *Bone v. State*, 77 S.W.3d 828, 833 n.13 (Tex. Crim.

---

[7]The *Strickland* test applies to "challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

App. 2002) (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). When a party raises an ineffective assistance of counsel claim for the first time on direct appeal, the defendant must show that "under prevailing professional norms," *Strickland*, 466 U.S. at 688, no competent attorney would do what trial counsel did or no competent attorney would fail to do what trial counsel failed to do, *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

"[A] plea of guilty is a matter of trial strategy." *See Enard v. State*, 764 S.W.2d 574, 575–76 (Tex. App.—Houston [14th Dist.] 1989, no pet.). There are legitimate, strategic reasons that counsel could have advised Lawson to plead guilty and forgo having the jury determine whether his confession was voluntary. Counsel could have feared that the jury would have found his confession voluntary. Furthermore, there was strong evidence against him, as C.W.'s testimony was likely to support conviction. Seeking a lesser sentence, Lawson could argue he showed remorse during his interview and that, by pleading guilty, he had taken responsibility for his actions. Because the record is silent and there are legitimate possible reasons as to why trial counsel advised Lawson to plead guilty, he has failed to overcome the presumption that counsel's actions were reasonable. *Mata*, 226 S.W.3d at 431. Accordingly, we overrule this point of error and affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:     October 24, 2022
Date Decided:       November 17, 2022

Do Not Publish

17