

# NUMBER 13-11-00505-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**ERNESTO IVAN MARTINEZ,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                    **Appellee.**

---

## On appeal from the 404th District Court
## of Cameron County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Chief Justice Valdez

Pursuant to a plea bargain agreement with the State, appellant, Ernesto Ivan Martinez, pleaded no contest to murder and was sentenced to life imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011). By three issues, which we have renumbered as four, Martinez contends that the trial court abused its discretion by denying his motion to suppress his confession because, for various reasons, the confession was not voluntary. We affirm.

# I. MOTION TO SUPPRESS HEARING

At the motion to suppress hearing, Detective Thomas Clipper of the Brownsville Police Department testified that he was involved in the investigation of Barry Horn's murder. Horn was found in his home by a coworker and had been stabbed approximately sixty times. Detective Clipper stated that Horn's vehicle, wallet, and cell phone were missing. Detective Clipper discovered that Horn had previously filed two "burglary reports" and that Martinez was the suspect in those crimes. On October 26, 2009, two days after the discovery of Horn's body, Martinez was found in Matamoros, Mexico, in possession of Horn's vehicle. Detective Clipper testified that at that point, Martinez became a "person of interest" in Horn's murder. Martinez was apprehended by Mexican police and was sent back to the United States where he was arrested for "being in possession of stolen property."

Detective Clipper stated that he conducted a video-recorded interview of Martinez, which was admitted into evidence at the suppression hearing. The video, taken on October 26, 2009 at 10:58 p.m., shows that Detective Cris Ortiz began the interview by reading Martinez his *Miranda* warnings. Martinez indicated that he understood the warnings by initialing and signing a form; Martinez stated that during the interview he understood his rights after Detective Ortiz explained them to him.[1]

Detective Clipper asked Martinez if he knew why he was there, and Martinez replied that he did not. Detective Clipper asked Martinez where he was before he was brought to Brownsville, Texas. Martinez stated that he was in Matamoros at his

---

[1] The video shows that Detective Ortiz explained each warning to Martinez and asked him if he understood the warning. Martinez stated that he understood each warning, and Martinez initialed and signed a form containing the warnings.

2

grandmother's house. When asked what vehicle he was driving, Martinez said that he was driving a "Hyundai Sonora" belonging to Horn. Detective Clipper then asked, "Who was Barry Horn," and Martinez replied, "The guy that has been murdered."[2]

Detective Clipper then asked Martinez to explain how he gained control of Horn's vehicle. Martinez explained that at midnight, Horn and a man named "Will" called him on his cell phone and invited him to Horn's home. Martinez did not know his own cell phone number. Detective Ortiz explained that the police could review Horn's phone records to determine whether Horn actually called Martinez. Martinez then stated that Horn did not call his cell phone but instead called his cousin's phone.

Martinez explained that after being invited, he walked to Horn's home. Martinez explained that the following occurred:

> And they [Horn and Will] were there and they were just drinking some wine, and I don't know what else, and I was just talking there. I just got there and I went to sat [sic] down and just talked to them. Just talking to them, and then they . . . An hour passed and they went . . . Barry and Will, they went to the room and they starting [sic] discussing about something. I don't know about what.
>
> . . . .
>
> They were arguing.
>
> . . . .
>
> About some money. I don't know about what money, and then Mr. Will, Mr. Barry Horn's friend, he went outside.
>
> . . . .
>
> To his truck, and he just went in and I didn't see him what he had in his hand and he had a bat, and he just beat me up. I have a ball right here. He hit me right here and I just got . . . I just feel [sic] unconscious, and he started beating me up too on my ankles and my knees and on my back.

---

[2] During the video-taped interview, neither detective told Martinez that Horn had been murdered.

3

. . . .

I just feel [sic] unconscious and like when I woke up, I didn't have my pants on, and Mr. Barry Horn he was just over there in the hallway, Sir. He was just laying there all stabbed, Sir, and I didn't have my pants on.

. . . .

And then I just got scared and I just grabbed Mr. Barry Horn's car keys and I just took off to Mexico.

Detective Clipper said that Horn had previously asked Martinez to stay away from his property because Horn believed Martinez had been stealing from him. Detective Clipper stated,

This comes from several people. Several people. Even your brother said that Mr. Horn did not want you on the property anymore. Why? Because you were stealing, using his credit card without permission. The whole nine yards. Okay. Is that true? That's true. He told you not to go to the house anymore.

Martinez replied, "He did tell me once, sir, but then he called me, Sir. I'm saying [sic] the truth, Sir." Martinez agreed that Horn had changed the locks to his house and that he did not have a key to Horn's home. The detectives told Martinez that his fingerprints were found on Horn's bathroom window and that they believed that was how Martinez had entered Horn's residence. Martinez claimed he was "doing number two" and that was why he had opened the bathroom window.

After Detective Ortiz pointed out that there was evidence that Martinez climbed in Horn's bathroom window and that Martinez needed to be honest, Martinez said, "I did it, Sir. . . . I did it because he raped me, Sir." Martinez said, "I got very drunk sir, and I got very pissed off sir because they . . . [b]ecause I was remembering that. Because he had been . . . [b]ecause he raped me. . . . [a] couple of weeks before." Martinez told

4

the detectives that Will was not present when he committed the murder. Martinez said that he had climbed in through the bathroom window after trying to open several windows. Martinez admitted that he had stabbed Horn with a kitchen knife and that he had disposed of the knife by throwing it into a ditch. Martinez stated that he then grabbed the keys to Horn's vehicle and drove to Mexico.

Later, Martinez said, "I want to stop, Sir. I want to stop." Detective Clipper asked Martinez if he needed a break, and Martinez replied that he did. Martinez then asked that the camera be turned off because he did not want to talk anymore, and Detective Clipper stopped the interview.

After this video was played for the trial court, Martinez's defense attorney asked Detective Clipper to explain why Detective Ortiz said something to the effect of, "Tell us what happened so we can help you." Detective Clipper stated he was not sure what Detective Ortiz was implying. When asked if Martinez asked permission to speak to a family member, Detective Clipper said that Martinez asked him "to call his girlfriend."

According to Detective Clipper, Martinez was "magistrated" either on the 27th or 28th of October. Detective Clipper was not sure on which date it occurred; however, he was sure that it did not occur on the morning of the 27th because on that day, Martinez asked to speak with Detective Clipper again. Detective Clipper explained:

> I went downstairs to see what the procedure was with the magistration, and then I advised him that I wasn't able to contact his girlfriend, so he would know that I did make an attempt to contact his girlfriend. And that's when he asked me, "Hey, I want to talk to you about something," and I said, "Okay, but I'm not going to talk to [you] just here, I need to read you your rights again."

Detective Clipper testified that because he was not expecting to interview Martinez again that morning, it took him a while to set up the interview. He had to

5

locate another detective to sit in on the interview, and he had to acquire a tape for the video recorder.  Once he was organized, Detective Clipper started the video recorder. Detective Clipper stated that Martinez acknowledged on the video that he had asked Detective Clipper to conduct the second interview.  The trial court asked Detective Clipper to explain how Martinez made contact with him if he was in jail.  Detective Clipper elaborated:

> They're lining them up in the morning, I'm assuming to go in front of the magistrate.  And I said—I was down there to do the magistrate.  I wanted to see who the judge was and stuff like that so I could be aware of it.  And the—I said, "I tried to contact your girlfriend, actually twice, and she didn't answer."  He just nods his head okay.  And he goes, "I need to talk to you, Detective."  And I said, "Okay.  So if you talk to me, I need to read your rights on anything [sic]."  So at that time, we walked him upstairs.

The video of Martinez's second statement was admitted into evidence.  In the video, the following exchange occurred:

[Detective Clipper]: And right now, you [Martinez] know, you're being recorded on camera.  Uhm . . . yesterday you ended the interview by saying you wanted to stop.  You wanted a break or whatever.

[Martinez]: Yes, Sir.

[Detective Clipper]: And this morning you contacted me and said you just want to talk.  I said okay.  So I came and I setup the camera.  I told you we're going to have to reread you your rights because yesterday was one interview.  Today's the second interview.  Okay?  Uhm . . . and I'm going to put that up here.  Uhm . . . Two for second interview.  Okay?  Uhm . . . and you said you just wanted to tell me the truth now.  Is that correct?

[Martinez]: Yes, Sir.

[Detective Clipper]: Cause you know what you said.  I'm going to ask Detective Vallejo to read your rights to you.  Is that okay or do you want to read them?

6

[Martinez]:          No.  That's okay.

[Detective Clipper]:  Okay.

[Detective Vallejo]:  You want me to read them to you?

[Martinez]:          Yeah.

Detective Vallejo proceeded to read the *Miranda* warnings to Martinez, stating that:  (1) he had the right to remain silent and not make any statement; (2) any statement Martinez made may be used as evidence against him in court; (3) he had the right to have a lawyer present to advise him prior to and during the questioning; (4) if he was unable to employ a lawyer, he had the right to have a lawyer appointed to advise him prior to and during the questioning; and (5) he had the right to terminate the interview at any time.  *See Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966).  Martinez stated that he understood those rights, and he wrote his initials next to each statement on the document.  Detective Vallejo read the following to Martinez:

> I have read this statement of my rights, and this statement of my rights has been read to me, and I understand what my rights are.  I am willing to discuss subjects presented and answer questions.  I do not want a lawyer at this [time].  I understand and know what I am doing.  No promise or threats have been made to me, and no pressure or coercion has been used against me.

Martinez stated that he understood this waiver of his rights, and he signed the document.  In addition to verbally acknowledging that he initiated the second interview and that he understood his rights, Martinez indicated he understood and that he initiated the interview by nodding his head up and down.

During the second interview, Martinez repeated the same set of facts that he set out in the first interview.  Martinez explained that he became intoxicated at a party,

7

became angry at Horn, entered Horn's home by climbing in the bathroom window, used a kitchen knife he brought from his aunt's home to kill Horn, and took Horn's car to Matamoros. Martinez, however, provided additional details of the events that evening. He stated that a friend named "Chino" gave him a ride to Horn's house and waited for him at a nearby abandoned house. Martinez described how he attempted to enter Horn's residence through sliding doors that were locked and then discovered the open bathroom window. Martinez continued to maintain that although he took Horn's car, he did not take Horn's wallet or cell phone after the murder.

Martinez admitted that he did steal a television set from Horn's residence on October 22, 2009. Martinez explained that on that date, he used a key to enter Horn's residence without permission. Martinez sold the television to "Taxis" in Mexico. At the conclusion of the interview, Detective Clipper stated, "Okay. You called this meeting. You're the one that said hey I want to tell you the truth. So do you have anything else to tell me?" Martinez replied, "No, Sir." The interview ended at 9:18 a.m. on October 27, 2009.

A final third video tape was admitted into evidence. Detective Clipper described the video as a "walk-thru" of Horn's residence involving Martinez and Detective Clipper that took place later that day. Detective Clipper did not participate in this video.

On cross-examination by the State, Detective Clipper testified that based on his experience, he believed Martinez understood that he had waived his rights. Detective Clipper agreed that by asking to stop the video tape, Martinez indicated that he understood that he had several rights he could invoke and that at that point, Martinez actually invoked his right to stop the interview. Detective Clipper stated that he never

promised that he would do anything for Martinez if Martinez cooperated with him, and he never threatened or coerced him into cooperating. According to Detective Clipper, Martinez never asked to speak to a lawyer at any time. The prosecutor asked, "You didn't say to him, 'If you want to know about your girlfriend, come talk to me'?" and Detective Clipper replied, "No, sir." Detective Clipper affirmed that he did not initiate the second interview with Martinez and that he merely informed Martinez that he could not contact Martinez's girlfriend. Detective Clipper testified that he "made it clear on the video" that Martinez had requested the second interview "[b]y stating at the beginning of the video he's the one that wanted to interview, go ahead and say what he wanted to say." Detective Clipper stated that Martinez agreed with those facts.

Martinez testified that when the Brownsville police took custody of him, he complained that he was injured so the detectives took him to the hospital.[3] Martinez was then taken to the police station. Martinez claimed that "[t]hey told [him] [he] had to make a statement because—well, because I had the car. . . ." Martinez stated that he did not want to make a statement and that before the interview, "[he] was told that [he] was supposed to make a statement because if [he] didn't make one, [his] family was going to get incarcerated." Martinez testified that he would not have made a statement if he had not been told his family would be arrested. Martinez stated that although he signed the documents indicating he understood that he was waiving his rights, he "didn't feel like it was out of [his] free will." Martinez testified that Detective Clipper told him he had to make the second statement. Martinez stated that he did not understand the consequences of signing the document waiving his rights. Regarding the "walk-thru,"

---

[3] Martinez claimed that the Mexican police beat him with a bat on two occasions.

9

Martinez claimed that he did not want to do it, but that Detective Ortiz made him do it and told him "what [he] had to do, [and] what [he] had to say[.]" Specifically, Martinez claimed that Detective Ortiz told him what to say concerning Horn's murder and asked him to admit that he had committed the crime. According to Martinez, Detective Ortiz spoke with him for more than three hours before the "walk-thru." Martinez agreed that Detective Ortiz "[w]as giving [him] specific facts" to say on the tape. Martinez insisted that the facts he stated during the "walk-thru" were facts that Detective Ortiz told him to say.

When asked how long it was before he saw a judge for magistration, Martinez replied, "I believe it was almost 72 hours." Martinez stated that he saw the magistrate the day after the second interview and walk-thru. Martinez testified that he was turned over to the Brownsville police at about 7:30 p.m.

On cross-examination by the State, Martinez agreed that before the first interview, he was informed that he had a right to remain silent, anything he said could be used against him at his trial, he had a right to have a lawyer present before and during any questioning, if he did not have the ability to hire a lawyer the court would appoint one, and he had a right to terminate the interview at any time. Martinez agreed that he initialed the document indicating that he understood each of those rights and that he signed the document indicating that those rights had been read to him, he understood those rights, he was willing to answer questions, and that he did not want a lawyer. The document admitted into evidence shows that Martinez signed the document on October 26, 2009 at 11:03 p.m.

Martinez agreed that on October 27, 2009, before the second interview, the

10

same rights were read to him; that on a second document he initialed next to each right; and that he signed the document indicating that those rights were read to him, he understood those rights, he was willing to answer questions, and he did not want a lawyer. Martinez stated that he signed the document on October 27, 2009 at 8:03 a.m. Martinez agreed that before the "walk-thru" of Horn's residence, on October 27, 2009, he was again informed of the same rights, he initialed a third document, and he signed that document. The document shows that Martinez signed it on October 27, 2009 at 10:41 a.m. Martinez agreed that someone read these rights to him a fourth time at an abandoned house, which was documented on the video, and that he signed the bottom of the third document indicating that those rights had been read to him a fourth time at 11:41 a.m. on October 27, 2009. Martinez agreed that the rights were read to him a fifth time on October 27 at 11:59 a.m. when he was taken to Alton Gloor Road in Brownsville, which was also documented on the video. Again, Martinez signed the bottom of the third document indicating that the rights had been read to him at that time. After the prosecutor reviewed the time line of October 27 with Martinez, Martinez agreed that it was not possible that Detective Ortiz talked to him for over three hours before the walk-thru. Martinez acknowledged that he was aware of his right to remain silent, to have a lawyer present before and during the interview, and that if he could not hire a lawyer the court would appoint one. Martinez agreed that he invoked the right to remain silent by asking the detectives to stop the video and that the detectives stopped the video. Martinez also agreed that the detectives did not ask him any more questions after he asked that they stop the video.

During cross-examination by the State, the following exchange occurred:

11

[The State:] Okay. At first during that statement, you tell Detective Clipper that you had nothing to do with the death of Barry Horn, right?

[Martinez:] Right.

Q. And then you tell Detective Clipper that you did kill Mr. Horn, right?

A. Right.

Q. At one point, you're lying, right? You can't have it both ways, is that correct, Mr. Martinez?

A. Correct.

Q. Either you did kill him or you didn't.

A. Correct.

Q. So you didn't feel so threatened as not to lie to Detective Clipper, right?

A. Right.

. . . .

Q. Mr. Martinez, if you felt so threatened that your family was going to be put in jail, you would have either tell them [sic] exactly what they wanted you to say or tell them the truth if that's what they wanted, right?

A. Right.

Q. But at some point you lie.

A. Right.

Martinez stated that he was brought before the judge on October 28, 2009 at "around 11:00 in the morning."

Martinez argued to the trial court that he was suffering from a physical ailment at the time of the interviews with police and that there is nothing in the video showing that

12

he had the "the ability and capacity to understand what those [*Miranda*] rights are . . . ." Martinez maintained that in order to waive a right, one must be aware of his rights under the circumstances and that he was not aware of those rights. Martinez then requested that his statements to the detectives be suppressed. The State countered that the evidence before the trial court showed that Martinez understood his rights and chose to waive them. The trial court then denied Martinez's motion to suppress the video statements.

Martinez pleaded guilty to murder, and the trial court sentenced him to life in prison. This appeal followed.

## II. STANDARD OF REVIEW

Whether the trial court properly denied a defendant's motion to suppress is reviewed under a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Scardino v. State*, 294 S.W.3d 401, 405 (Tex. App.—Corpus Christi 2009, no pet.). We give almost total deference to the trial court's determination of historical facts and review de novo the trial court's application of law to facts not turning on credibility and demeanor. *Scardino*, 294 S.W.3d at 405; *see Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). When, as in this case, the trial court makes no explicit findings of historical fact, the evidence must be viewed in the light most favorable to the trial court's ruling. *St. George*, 237 S.W.3d at 725. We must uphold the trial court's ruling if it is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005). "Absent a clear abuse of discretion, the ruling on the admissibility of evidence will not be disturbed." *Fonseca v. State*, 881

13

S.W.2d 144, 149 (Tex. App.—Corpus Christi 1994, no pet.) (citing *Rivera v. State*, 808 S.W.2d 80, 96 (Tex. Crim. App. 1991)).

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). "To decide this case the court of appeals must examine the totality of the circumstances surrounding the acquisition of the statement to determine whether it was given voluntarily." *Creager v. State*, 952 S.W.2d 852, 856–57 (Tex. Crim. App. 1997) (en banc); *Sossamon v. State*, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991) (en banc), *abrogated on other grounds by Graham v. State*, 994 S.W.2d 651, 656 (Tex. Crim. App. 1999) (quoting *Fisher v. State*, 379 S.W.2d 900, 902 (Tex. Crim. App. 1964)).

### III.   DISCUSSION

By his first through fourth issues, Martinez contends that his confession was involuntary because: (1)  the detectives told him that the questioning concerned "theft by possession, but immediately began interviewing him about a possible capital murder, but without notifying him of the same"; (2) he invoked his right to "cut off questioning" which was not "scrupulously honored"; (3) the detectives threatened him concerning "what the judge and jury would do if he did not tell the truth"; and (4) he was not taken before the magistrate within forty-eight hours.

### A.   Notification of Murder Investigation

As we understand it, by his first issue, Martinez argues that his confession was rendered involuntary because he was arrested for theft and the detectives allegedly hid from him the fact that they were investigating Horn's murder. Martinez appears to imply

that in order for his confession to have been voluntary, the detectives were under an obligation to tell him that they were investigating the murder and not the theft. However, Martinez has cited no authority, and we find none, providing that a defendant's confession is rendered involuntary because he has been arrested for an offense other than the offense which he has confessed to committing. Furthermore, the record shows that during the first interview, it was Martinez who brought up the subject of Horn's murder. When Detective Clipper asked Martinez whose vehicle he was driving, Martinez responded that he was in Horn's vehicle. Then, when Detective Clipper asked Martinez who Horn was, Martinez replied, "The guy that has been murdered." It was Martinez who volunteered information concerning Horn's death. Finally, at the suppression hearing, Martinez did not argue that he was somehow "tricked" into confessing because the detectives allegedly failed to inform him that they were investigating Horn's murder. *See* TEX. R. APP. P. 33.1. Under these circumstances, we cannot conclude that the trial court abused its discretion by denying Martinez's motion to suppress his confession on this basis. We overrule Martinez's first issue.

## B. Right to Cut Off Questioning

By his second issue, Martinez contends that the detectives violated his right to remain silent because they did not respect his right to cut off questioning.

A defendant must be advised of his right to remain silent before a custodial interrogation. *Miranda*, 384 U.S. at 467–68. The failure to cut off questioning after a suspect invokes his right to remain silent is a violation and any subsequently-obtained statements are inadmissible. *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975); *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). "The *Mosley* Court rejected any

15

reading of *Miranda* under which a person who has invoked his right to silence can never again be subjected to custodial interrogation. Instead, the admissibility of statements obtained after a person in custody has decided to remain silent depends on whether the right to cut off questioning was scrupulously honored." *Williams v. State*, 257 S.W.3d 426, 435 (Tex. App.—Austin 2008, pet. ref'd) (internal citations omitted); *see Mosley*, 423 U.S. at 102–04. We determine whether the defendant's right to remain silent was scrupulously honored based on the facts and circumstances of each case. *Maestas v. State*, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999). In making this determination, the court of criminal appeals has stated we consider the following five factors:

> 1) whether the suspect was informed of his right to remain silent prior to the initial questioning; (2) whether the suspect was informed of his right to remain silent prior to the subsequent questioning; (3) the length of time between initial questioning and subsequent questioning; (4) whether the subsequent questioning focused on a different crime;[4] and (5) whether police honored the suspect's initial invocation of the right to remain silent.

*Maestas*, 987 S.W.2d at 62.

---

[4] In *Maestas v. State*, the court of criminal appeals acknowledged that the subsequent questioning of the appellant concerned the same crime. 987 S.W.2d 59, 64 (Tex. Crim. App. 1999). However, the court determined that the officers had scrupulously honored the appellant's right to remain silent despite this fact. *Id.* The *Maestas* court stated:

> Subsequent questioning did not focus on a different crime, so the fourth *Mosley* factor does not weigh in favor of "scrupulous honoring." As part of the *Mosley* analysis, however, we also consider other facts and circumstances in determining whether Appellant's right to remain silent was "scrupulously honored." Appellant was not coerced, threatened, or promised anything for talking with officers. Officers testified Appellant had access to necessities such as food, water, and restroom facilities. Finally, although officers initiated the questioning that resulted in Appellant's statement, ongoing investigations provided them with additional information which tended to show that Appellant was present at the scene of the murder. These additional considerations tend to support the conclusion that police 'scrupulously honored' Appellant's right to remain silent.

*Id.*

Here, there was also testimony that Martinez had access to necessities and that he was not coerced, threatened, or promised anything for talking to officers. Moreover, officers in this case did not initiate the questioning that resulted in Martinez's subsequent statement. These additional considerations tend to support a finding that police scrupulously honored Martinez's right to remain silent.

16

Here, there is no dispute that Martinez was in custody and that he was told that he had the right to remain silent before making each of his statements to police. In his first statement to Detective Clipper, Martinez stated that he stabbed Horn with a knife before he invoked his right to remain silent; therefore, the trial court did not abuse its discretion in not suppressing this statement on the basis that the detectives did not scrupulously honor his right to remain silent. *See Mosley*, 423 U.S. at 102–04; *Dowthitt*, 931 S.W.2d at 257 (providing that even when the request to cut off questioning is not scrupulously honored, only statements obtained after the defendant invokes his right to remain silent are inadmissible).

Furthermore, viewing the evidence in the light most favorable to the trial court's ruling, we note that Detective Clipper ceased questioning Martinez during the first interview immediately when Martinez told him he did not want to talk any more. The trial court heard evidence that it was Martinez who initiated the second interview and not Detective Clipper. "This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Mosley*, 423 U.S. at 105–06. In contrast to such practices, the evidence here supported a finding that the police immediately ceased the first interview when Martinez stated he wanted to stop talking. The detectives did not approach Martinez to re-initiate questioning and instead resumed the questioning only after Martinez requested a second interview and after the passage of a significant period of time.[5] Moreover, the detectives provided a fresh set of warnings at

---

[5] The trial court was free to believe Detective Clipper's testimony that he merely approached Martinez to inform him that he was unable to contact Martinez's girlfriend and that Martinez asked for the

17

the subsequent interview, and Detective Clipper began the second interview by stating, "Tell me what you want to say." Martinez then explained the series of events that occurred on the date when Horn was murdered.

> Through the exercise of his option to terminate questioning [a defendant] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

*Id.* at 103–04. Here, there is evidence that supports a finding that Martinez was in control of the time at which the second interview occurred, the subjects discussed at that interview, and the duration of the interview. Thus, after considering the *Mosley* factors, we cannot conclude that the trial court abused its discretion in determining that the detectives scrupulously honored Martinez's right to cut off questioning. *See id.*; *Maestas*, 987 S.W.2d at 61 ("Following the *Miranda* language to its logical conclusion would produce the absurd result that no confession or inculpatory statement would ever be admissible—even if the accused changed his mind and wanted to speak with police after invoking the right to remain silent."); *see also Liner v. State*, No. 10-08-00362-CR, 2010 Tex. App. LEXIS 6989, at *8–9 (Tex. App.—Waco Aug. 25, 2010, no pet.) (mem. op., not designated for publication) (concluding that the trial court properly determined that the appellant's right to remain silent had not been violated under similar circumstances because it was the appellant who asked to talk to the police officer); *Urias v. State*, No. 08-01-00355-CR, 2006 Tex. App. LEXIS 7820, at *12–17 (Tex. App.—El Paso Aug. 31, 2006, pet. ref'd) (mem. op., not designated for publication) (same). We overrule Martinez's second issue.

---

second interview. *See Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996).

## C.    Threats

By his third issue, Martinez contends that he was coerced into confessing that he murdered Horn.   Martinez argues that he was coerced into confessing by Detective Ortiz's statement that "things would go better for him if he told the truth and [was] remorseful."  He also complains that he was told, "If we prove [you're] lying . . . it's only going to make things worse."   Martinez appears to argue that these statements constituted coercive threats.

"Coercive government misconduct renders a confession involuntary if the defendant's 'will has been overborne and his capacity for self-determination critically impaired.'"  *Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010).  We must take into consideration the totality of all the surrounding circumstances, which includes "both the characteristics of the accused and the details of the interrogation."  *Dickerson v. United States*, 530 U.S. 428, 434, (2000); *see also Springsteen v. State*, No. AP-74,223, 2006 Tex. Crim. App. LEXIS 2340, at \*30–31 (Tex. Crim. App. May 24, 2006). "The determination 'depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'"  *Dickerson*, 530 U.S. at 434; *see also Springsteen*, 2006 Tex. Crim. App. LEXIS 2340, at \*30–31.  The defendant's will may be "overborne" if the record shows that there was "official, coercive conduct of such a nature" that a statement from the defendant was "unlikely to have been the product of an essentially free and unconstrained choice by its maker."  *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); *Frank v. State*, 183 S.W.3d 63, 75 (Tex. App.—Fort Worth 2005, pet. ref'd). [6]

---

[6] The Texas Court of Criminal Appeals recognized the following:

First, Martinez generally alleges that Detective Clipper threatened him.  However, Martinez does not cite the portion of the record where Detective Clipper made any threats, and we cannot locate any.  Therefore, we conclude that this allegation is without merit.  Next, Martinez claims that the complained-of statements were threats.  However, at the suppression hearing, no evidence was presented that the complained-of statements caused Martinez to confess.  And a review of the video of the second interview shows that the colloquy between Detective Clipper and Martinez was conversational and that appellant was calm and cooperative.  There was no evidence that any of the detectives exhibited hostile, aggressive, or threatening behavior toward Martinez.  Also, Martinez acknowledged during cross-examination by the State that he did not feel threatened enough by the detectives not to initially lie about what happened on the night of Horn's death.  Therefore, considering the totality of the surrounding circumstances, the record supports a finding that Martinez's will was not overborne by the complained-of statements.  *See Dickerson*, 530 U.S. at 434; *see also Springsteen*, 2006 Tex. Crim. App. LEXIS 2340, at *30–31.  Furthermore, Martinez did not argue to the trial court that these statements constituted threats that caused him to confess.  *See*

Statements that have been found to be involuntary under *Miranda* or the Due Process Clause . . . [:]  (1) the suspect was subjected to a four-hour interrogation while incapacitated and sedated in an intensive-care unit; (2) the suspect, while on medication, was interrogated for over eighteen hours without food, medication, or sleep; (3) the police officers held a gun to the head of the wounded suspect to extract a confession; (4) the police interrogated the suspect intermittently for sixteen days using coercive tactics while he was held incommunicado in a closed cell without windows and was given limited food; (5) the suspect was held for four days with inadequate food and medical attention until he confessed; (6) the suspect was subjected to five days of repeated questioning during which police employed coercive tactics; (7) the suspect was held incommunicado for three days with little food, and the confession was obtained when officers informed him that their chief was preparing to admit a lynch mob into the jail; (8) the suspect was questioned by relays of officers for thirty-six hours without an opportunity for sleep.

*Oursbourn v. State*, 259 S.W.3d 159, 170–71 (Tex. Crim. App. 2008) (internal footnotes and citations omitted).

TEX. R. APP. P. 33.1. Accordingly, we overrule Martinez's third issue.

**D.    Unnecessary Delay in Presenting Martinez to the Magistrate**

By his fourth issue, Martinez argues that because he was allegedly not brought before a magistrate within forty-eight hours of being in custody, his statements should have been suppressed. *See* TEX. CODE CRIM. PROC. ANN. art. 15.17(a) (West Supp. 2011) ("In each case enumerated in this Code, the person making the arrest or the person having custody of the person arrested shall without unnecessary delay, but not later than 48 hours after the person is arrested, take the person arrested or have him taken before some magistrate of the county where the accused was arrested or, to provide more expeditiously to the person arrested the warnings described by this article, before a magistrate in any other county of this state. . . ."). However, based upon our review of the record, we conclude that there was evidence that Martinez was brought before the magistrate within forty-eight hours of being in police custody. Martinez testified that he was turned over to the Brownsville Police Department on October 26 at "[a]bout 7:30" p.m. and taken before the magistrate on October 28 at "around" 11:00 a.m. Thus, Martinez's complaint is without merit.

Nonetheless, to the extent that Martinez claims that the detectives purposefully caused an unnecessary delay in taking him to see the magistrate, we note that, "[a]bsent a showing of a causal connection between the failure to take an accused before a magistrate and the accused's confession, however, the validity of a confession is not affected for failure to comply with the statute." *Boyd v. State*, 811 S.W.2d 105, 124–25 (Tex. Crim. App. 1991). Here, Martinez did not testify that the alleged unnecessary delay played a role in his decision to confess, as he now appears to argue

21

on appeal. Instead, Martinez testified that he confessed because he did not feel that he had a choice and that the detectives threatened to arrest his family.[7] Therefore, the record does not support a finding of a causal connection between any failure to timely take Martinez before the magistrate and his confession. Moreover, "an unreasonable delay in presenting an arrestee before a magistrate will not vitiate an otherwise voluntary confession if the arrestee was properly advised of his *Miranda* rights." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992); *Boyd*, 811 S.W.2d at 125 ("[A] violation of the requirement that a defendant be taken before a magistrate without delay will not invalidate a confession which was voluntarily given after a defendant received his [*Miranda*] rights."); *see County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (noting that, as a general rule, a forty-eight hour delay without presentment before a magistrate is not an unnecessary delay). Here, the record clearly shows that the detectives read the *Miranda* warnings to Martinez each time he made a statement to them. Thus, the trial court did not abuse its discretion in denying Martinez's motion to suppress his confession on that basis. We overrule Martinez's fourth issue.

## IV.  CONCLUSION

We affirm the trial court's denial of Martinez's motion to suppress.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
15th day of March, 2012.

---

[7] We note that the trial court was free to disbelieve Martinez's assertion that the detectives made such a threat. *See Green*, 934 S.W.2d at 98.

22