**AFFIRM; and Opinion Filed July 31, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00125-CR

### JOSHUA JUAREZ, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 6
Dallas County, Texas
Trial Court Cause No. F11-00551-X**

## OPINION
Before Justices O'Neill, Francis, and Fillmore
Opinion by Justice Fillmore

A jury convicted Joshua Juarez of burglary of a habitation. Juarez pleaded true to the enhancement paragraph in the indictment, and the trial court sentenced Juarez to twenty-five years' imprisonment. In his first three points of error, Juarez contends that, during the punishment phase of the trial, the trial court erred by admitting into evidence a recording of a statement given by Juarez, because the police failed to scrupulously honor his *Miranda*[1] rights in obtaining the statement and the statement was obtained in violation of the deliberate "question first, warn later" strategy denounced in *Missouri v. Seibert*, 542 U.S. 600 (2004), and by permitting improper impeachment of defense witnesses. Juarez finally complains, in his fourth

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

point of error, that there is insufficient evidence to support the trial court's order requiring him to pay $264 in court costs. We affirm the trial court's judgment.

## Background

On August 2, 2010, Juarez and Joe Rodriguez burglarized Cheryl Blackwell's home. During the guilt phase of the trial, Blackwell testified about the property that was stolen from, and the damage that was done to, her home. Juarez's judicial confession admitting to the burglary was admitted into evidence. The jury was discharged after finding Juarez guilty of burglary of a habitation, and the trial court conducted a bench trial as to punishment.

During the punishment phase of the trial, the trial court heard evidence about a number of offenses committed by Juarez. Regarding the burglary of Blackwell's home, the State presented evidence that both Juarez's and Rodriguez's fingerprints were found in Blackwell's house. Further, a cellphone found in Blackwell's driveway following the burglary was traced to Crusila De La Torre. De La Torre testified that, between 10:30 and 11:00 a.m. on August 2, 2010, she received several calls from Rodriguez asking her to pick him up at an address that was established to be the address of Blackwell's home. When De La Torre arrived at the house, Rodriguez and Juarez began loading things into her car. De La Torre got out of her car and saw what they were doing. She panicked and said she was leaving. Rodriguez and Juarez got into the car, and De La Torre took them to a 7-Eleven. Rodriguez and Juarez moved the items they had loaded into De La Torre's car to their car, and De La Torre left.

Juan Lopez testified that, at approximately 6:00 a.m. on August 2, 2010, he stopped at a 7-Eleven to buy coffee. He saw two people in the store. "The smaller one" was wearing a white shirt and "the bigger one" had tattoos. After buying his coffee, Lopez returned to his car. He placed the coffee in the cup holder and turned to close the car door, but was unable to do so because the two people from the store were standing between the car and the door. The "older

one" asked for a ride to Dallas. Lopez said no because he was on his way to work. The man responded "more aggressively" that Lopez should take the two men to Dallas. When Lopez again said no, both men started pulling on him. The smaller man in the white shirt pulled on Lopez's shirt and arm and the bigger man pulled on Lopez's leg. The bigger man said that if Lopez did not get out of the car, they were going to kill him. Lopez grabbed the steering wheel with his hands and hooked his foot under the accelerator. He started honking his horn and yelling. When people came out of the store, the two men ran away. Juarez later gave a statement confirming he was the man in the white shirt.

At 1:00 p.m., on August 2, 2010, Kelly Ripley Gates was standing in a parking lot beside a car she was planning to buy when she was approached by two Hispanic men with tattoos. The men got into the car. Gates fought with the "bigger man," but was unable to get him out of the car. Gates identified this man as Rodriguez, but did not identify the second man. When the car was recovered, the title and key to Blackwell's car were found inside of it.

Shair Zembek testified that, on August 5, 2010, she was the manager of Helzberg Diamonds at Irving Mall. At approximately 11:00 a.m., a Hispanic male came into the store and said he was looking for a gift for his mother. When Zembek showed the man two diamond bracelets, he grabbed them and ran out of the store. Juarez later confessed to the theft.

Courtney Spencer testified that, on August 9, 2010, she was working at Kay Jewelers at Vista Ridge Mall when two Hispanic males and a Hispanic female came into the store. Spencer identified Juarez as one of the people who came into the store. Because the three people matched a description given in an email to all Kay Jewelers' stores in the area about thefts that had been committed, Spencer called the police. Officer Brian Gibbons of the Lewisville police department responded to the call. Juarez identified himself to Gibbons as Mark Anthony Juarez. Because Juarez did not have any identification, Gibbons asked him to come to the police station

to be fingerprinted. On the way to the station, Juarez admitted he had given a false name, but refused to disclose his true identity.

Dallas police officer Michael McMurray testified that, on June 3, 2004, Juarez was a passenger in a car that was subject to a "felony stop" based on a burglary of a motor vehicle. Juarez, who was fourteen at the time, was charged with possession of marijuana. Dallas police officer Robert Baird testified that, on June 11, 2004, he saw Juarez driving a car with four or five people in it. Juarez parked parallel to another car, and the passengers in Juarez vehicle broke into the second car. Juarez followed the second car as it drove away. Juarez was charged with unauthorized use of a motor vehicle. Several witnesses testified about two aggravated robberies that Juarez, along with his brother and another individual, committed on July 10, 2004. During one of the robberies, Juarez stayed in the car. However, during the other robbery, Juarez held a crowbar while his brother held a gun. Based on the two aggravated robberies, Juarez was adjudicated a child engaged in delinquent conduct and committed to the custody and control of the Texas Youth Commission (TYC) for a period of ten years.

Juarez's grandmother and two of his sisters testified about Juarez's difficult childhood. Juarez's two sisters testified Juarez was influenced by his older brother, resulting in the juvenile aggravated robbery convictions. They also testified that, after Juarez was paroled from TYC, he began taking drugs and hanging around with older individuals. They believed Juarez "got in with the wrong crowd," and that his conduct was "not who he was." Juarez requested rehabilitation and treatment. The trial court sentenced Juarez to twenty-five years' imprisonment.

**Juarez's Statement**

In his first two points of error, Juarez contends the trial court erred by admitting into evidence a recording of a statement he gave to the police because the interrogating officer failed

–4–

to scrupulously honor his *Miranda* rights in obtaining the statement, and the statement was obtained through the use of the deliberate "question first, warn later" strategy denounced in *Seibert*.

## *Standard of Review*

We review a trial court's denial of a *Miranda*-violation claim under a bifurcated standard. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App.), *cert. denied*, 133 S. Ct. 122 (2012). We afford almost total deference to the trial court's factual findings and its application of law to fact rulings that turn on credibility and demeanor. *Id*. We review de novo the trial court's rulings on application of law to fact questions that do not turn on credibility and demeanor. *Id.*

## *Relevant Facts*

Detective Teddy Yoshida investigated the attempted robbery of Lopez at the 7-Eleven and learned about the burglary of Blackwell's home. Because there was less than 1,000 feet between Blackwell's house and the 7-Eleven and because the incidents were close in time, Yoshida believed the same people had committed both crimes. Yoshida determined Juarez was a suspect in the robbery, learned that he was incarcerated in Denton, and went to interview him. The interview was recorded.

Yoshida began by asking Juarez questions about his sister and his grandmother, with whom Juarez had been living at some point. Yoshida asked Juarez about his sister's name, age, telephone number, and marital status and about the location of her boyfriend. In response to Yoshida's questions, Juarez confirmed he did not have a cellphone and indicated he did not know whether his grandmother had a telephone. Juarez stated that he was currently "living on the streets," but staying with friends, "not outside." Yoshida also asked questions pertaining to whether Juarez was employed.

Yoshida asked Juarez about how he was being treated in jail. Juarez then indicated he was incarcerated in Denton for using his cousin's name when he was detained in the Vista Ridge Mall. Yoshida asked if Juarez had been attending school, and Juarez responded he had not attended school since he "got out of TYC." Yoshida questioned Juarez about why he was in TYC, and Juarez responded that he went to TYC when he was fourteen years old for an aggravated robbery he committed with his brother. He received a ten year sentence and "wound up doing" four and one-half years. He stated he was currently on parole and had been trying to "get straight."

Yoshida then read Juarez his *Miranda* rights and Juarez indicated he understood his rights. Yoshida asked if he agreed to waive his rights and to talk to Yoshida and his partner. Juarez initially did not answer and then stated "I don't know what you're here for." Yoshida responded that they wanted to discuss that topic. Juarez then stated "I don't really want to talk, but I don't even know what you're here for. [You] say ya'll are here from Richardson." Yoshida responded that if Juarez did not want to talk, they had to stop the interview. However, if Juarez was willing to talk to them, "we'll keep going." Juarez responded, "What are ya'll here for?" Yoshida's partner then asked, "Is it ok if we talk for a while, then if you want to stop, we'll stop." Juarez responded, "Yeah, it's all right." Yoshida stated, "Just say 'I'm done" and we'll stop." Juarez responded, "Yeah."

In response to Yoshida's questions, Juarez confirmed that he had been staying with Rodriguez for a month or two. He denied going with Rodriguez to Richardson, but stated he had been smoking a "lot of ice" and did not remember everything he had done. Juarez reviewed pictures taken from the video surveillance system at the 7-Eleven and confirmed he was the man in the white shirt. When Yoshida asked if Juarez remembered what happened that day, Juarez

responded that he did not want to talk any longer and wanted to speak with his attorney. Yoshida terminated the interview.

At trial, Juarez objected to the admission of the statement on the basis that he invoked his right to remain silent during the course of the interview and that the police officers began interrogation without reading him his *Miranda* rights. The trial court overruled the objection and admitted the recorded statement.

### *Invocation of Rights*

In his first point of error, Juarez asserts he invoked his right to remain silent and the police officers failed to scrupulously honor the assertion of that right. In support of his argument, Juarez points to his statement that he really did not want to talk.

The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amends. V & XIV; *see also Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). The protection against self-incrimination is violated when a law enforcement officer has elicited an involuntary confession from a criminal defendant. *Bram v. United States*, 168 U.S. 532, 542–43 (1897); *see also Rogers v. Richmond*, 365 U.S. 534, 544 (1961). A confession is presumed to be involuntary if it was made pursuant to a custodial interrogation and without adequate warnings to protect the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).[2] Unwarned confessions are accorded this presumption because "'the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk' that the privilege against self-incrimination will not be observed." *Carter v.*

---

[2] *See also Hunt v. State*, No. PD-0152-12, 2013 WL 3282973, at *3 (Tex. Crim. App. June 26, 2013) (not designated for publication).

*State*, 309 S.W.3d 31, 35 (Tex. Crim. App. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 435 (2000)).

Consistent with this protection against self-incrimination, law enforcement officials, before questioning a person in custody, must inform him that he has a right to remain silent and that any statement he makes may be used against him in court. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010); *Miranda*, 384 U.S. at 444–45, 478–79. The right to remain silent requires the police to immediately cease custodial interrogation when a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." *Ramos*, 245 S.W.3d at 418 (quoting *Miranda*, 384 U.S. at 473–74). The suspect does not need to use any particular word or phrase to invoke the right to remain silent. *Id.* Any declaration of a desire to terminate the contact or inquiry should suffice. *Id.* The suspect need not object to further questioning in order to protect the right to remain silent. *Watson v. State*, 762 S.W.2d 591, 599 (Tex. Crim. App. 1988).

The exercise of the right to remain silent must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *Ramos*, 245 S.W.3d at 418. A failure to stop questioning after a suspect in custody invokes his right to remain silent violates his constitutional rights and renders any subsequently obtained statements inadmissible. *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). A law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change his mind and talk. *Id.* But an officer is not required to ask clarifying questions and, if the suspect's statement is not an unambiguous or unequivocal request to terminate the interview or to invoke the right to silence, the officer has no obligation to stop questioning him. *Berghuis*, 130 S. Ct. at 2259–60 ("If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation or ask questions to

–8–

clarify whether the accused wants to invoke his or her *Miranda* rights" and there is no principled reason to apply different standard for invocation of right to remain silent); *Marshall v. State*, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006) (when invocation of right to remain silent is ambiguous, officer can either continue questioning "regarding the offense" or stop questioning and clarify whether suspect wanted to remain silent); *Dowthitt*, 931 S.W.2d at 257. Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances. *Luna v. State*, 301 S.W.3d 322, 325 (Tex. App.—Waco 2009, no pet.); *see also Dowthitt*, 931 S.W.2d at 257. In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Watson*, 762 S.W.2d at 597; *Luna*, 301 S.W.3d at 325.

Yoshida read Juarez his rights and confirmed that Juarez understood his rights. He then asked whether Juarez wanted to waive those rights and talk to Yoshida and his partner. Juarez paused and then responded that he did not know why the officers were there. Yoshida responded that they would like to discuss it, but Juarez had to agree to talk to them first. Juarez responded, "I don't really want to talk, but I don't even know what you're here for. [You] say ya'll are here from Richardson." Yoshida told Juarez that if he did not want to talk, they would terminate the interview; but, if Juarez wanted to talk to them, they would continue. Juarez again responded, "What are you here for?" Yoshida's partner then asked Juarez if he would agree to talk for a "little while," and they would stop the interview at Juarez's request. Juarez responded, "Yeah, it's all right."

Both before and after the statement that Juarez contends invoked his right to remain silent, Juarez questioned the police officers about why they were there. Considering the totality of the circumstances, including Juarez's repeated questions to the officers about what they wanted to discuss, Juarez's statement, "I don't really want to talk, but I don't even know what

you're here for. [You] say ya'll are here from Richardson," was not a clear unambiguous invocation of his right to remain silent. *See Kupferer v. State*, No. 01-11-00619-CR, 2013 WL 1341123, at *5 (Tex. App.—Houston [1st Dist.] Apr. 4, 2013, pet. ref'd) (defendant's statement that "I really don't want to talk about it, but I mean. . ." was not unambiguous invocation of right to remain silent); *William v. State*, 257 S.W.3d 426, 433–34 (Tex. App.—Austin 2008, pet. ref'd) (defendant's statement that "I want to terminate everything right now" was ambiguous given defendant's prior statements, his frustration at his detention, and his attempt to determine whether he had been arrested); *Mayes v. State*, 8 S.W.3d 354, 359 (Tex. App.—Amarillo 1999, no pet.) (statement by defendant that she did not know if she wanted to talk followed immediately by denial of wrongdoing was not unambiguous assertion of right to remain silent).[3] We resolve Juarez's first point of error against him.

### Midstream Warnings

In his second point of error, Juarez contends Yoshida used the deliberate "question first, warn later" or "midstream warning" technique proscribed by *Seibert*. *See Seibert*, 542 U.S. at 604; *see also Martinez v. State*, 272 S.W.3d 615, 624 (Tex. Crim. App. 2008). A "midstream warning" occurs when police begin a custodial interrogation without advising the suspect of his *Miranda* rights, obtain incriminating statements, and then continue questioning after administering warnings in order to re-elicit the incriminating statements. *Seibert*, 542 U.S. at 604.[4]

---

[3] *See also Cooksey v. State*, No. 05–08–01343–CR, 2009 WL 2488509, at *2 (Tex. App.—Dallas Aug. 17, 2009, pet. ref'd) (mem. op., not designated for publication) (statement that "I don't have anything to say" was ambiguous and did not require police officer to stop questioning defendant); *Esquivel v. State*, No. 04–08–00730–CR, 2009 WL 3222626, at *4 (Tex App.—San Antonio Oct. 7, 2009, no pet.) (mem. op., not designated for publication) (statement that defendant did not want to talk to detective was ambiguous in light of defendant continuing to talk to detective).

[4] *See also Batiste v. State*, No. AP-76600, 2013 WL 2424134, at *16 (Tex. Crim. App. June 5, 2013) (not designated for publication).

In the plurality opinion in *Seibert*, four justices of the Supreme Court concluded that a "question first, warn later" interrogation technique circumvented the objective of *Miranda* by rendering any warnings given ineffective. *Id*. at 611–13. The *Seibert* plurality found the purpose of this interrogation technique was to obtain a confession the suspect may not have made if he had understood his rights at the outset. *Id*. at 611. In his concurring opinion, Justice Kennedy determined that when a two-step interrogation technique is used in a deliberate, calculated way to undermine *Miranda* warnings, absent "curative measures," the post-warning statements must be excluded. *Id.* at 622 (Kennedy, J., concurring). In *Carter v. State*, 309 S.W.3d 31, 38 (Tex. Crim. App. 2010), the Texas Court of Criminal Appeals expressly adopted Justice Kennedy's concurring opinion in *Seibert* because his was the crucial fifth vote and his opinion was "narrower in scope than the plurality opinion and applies only to two-step interrogations involving deliberate police misconduct."[5] Thus, under the jurisprudence of this state, the central question when determining the admissibility of post-*Miranda* warning confessions made after *Miranda* violations is whether the evidence shows that the officer deliberately employed a two-step "question first, warn later" interrogation technique to circumvent the suspect's *Miranda* protections. *Id.* at 37.

Yoshida did not testify about his strategy in questioning Juarez. Rather, Yoshida's testimony about the interview was that he learned Juarez was incarcerated and went to interview him. During the interview, Yoshida advised Juarez of his *Miranda* rights and "he agreed to speak with me about the offense." Juarez subsequently identified himself as the person wearing the white shirt in the picture taken from the 7-Eleven surveillance video.

The trial court also heard the recording of Yoshida's interview with Juarez. That recording shows that, prior to the *Miranda* warnings being given, the dialogue between Juarez

---

[5] *See also Batiste*, 2013 WL 2424134, at *16.

and Yoshida was conversational. Juarez answered questions about where he had been living, contact information for his sister and grandmother, and whether he was employed. When asked how he was being treated in jail, Juarez volunteered information about the failure-to-identify charge. When asked if he had been going to school, Juarez volunteered information about his time in TYC and responded to questions about why he was sent to TYC. The unwarned statements did not relate to either the attempted robbery at the 7-Eleven or the burglary of Blackwell's house. Rather, they related to Juarez's past conduct for which he was sent to TYC and the failure-to-identify offense. There was no overlap between the pre-warning and post-warning questions.

We apply a "highly deferential review" to a trial court determination of an officer's subjective "deliberateness" in the "question first, warn later," context. *Id.* at 40. Here, in overruling Juarez's objection, the trial court did not make express factual findings as to whether Yoshida deliberately employed a "question first, warn later" technique. Thus, we imply fact findings that support the trial court's ruling so long as the evidence supports those implied findings, *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Vasquez v. State*, 397 S.W.3d 850, 855 (Tex. App.—Houston [14th Dist.] 2013, pet. granted).[6] On this record, we cannot conclude the trial court erred by finding there is no evidence of deliberate police misconduct designed to circumvent *Miranda*. *See Carter*, 309 S.W.3d at 40. We resolve Juarez's second point of error against him.

**Improper Impeachment**

In his third point of error, Juarez complains the trial court erred by permitting the prosecutor to cross-examine two defense witnesses with information about specific incidents of

---

[6] *See also Chavez v. State*, No. 05-11-00009-CR, 2012 WL 1949006, at *7 (Tex. App.—Dallas May 31, 2012, pet. ref'd) (not designated for publication).

conduct contained in a document not introduced into evidence. Juarez also asserts "[t]his was improper impeachment that resulted in a violation of Appellant's constitutional rights to confrontation."

*Standard of Review*

We review a trial court's decision on the admission of evidence for an abuse of discretion. *Blasdell v. State*, 384 S.W.3d 824, 829 (Tex. Crim. App. 2012). We uphold the trial court's ruling so long as it is within the zone of reasonable disagreement. *Id.*

*Relevant Facts*

Juarez's sisters, Vanessa Hernandez and Brandi Hernandez, testified about Juarez's childhood, abuse by Juarez's mother, and that Juarez was raised by his father and grandmother. Juarez's father worked long hours and was not around Juarez very much. In both Vanessa's and Brandi's opinions, Juarez was influenced by his older brother, Michael, before he was committed to TYC and by the older men he was associating with after being released from TYC. Both Vanessa and Brandi opined that Juarez was a good person who would not have committed the crimes of his own volition. Both requested that Juarez not be sent to prison.

On cross-examination, Vanessa confirmed that Juarez did not like to follow rules. She admitted she did not know about (1) Juarez's involvement in car theft in 2004, (2) his possession of marijuana, or (3) a theft of rings from Juarez's classmate. She also did not know how Juarez acted while he was in TYC, but admitted that any problems Juarez had in TYC could be due to his not liking rules. The prosecutor asked if Vanessa was aware that Juarez "had over 592 documented incidents in TYC." Vanessa indicated that surprised her. The prosecutor asked Vanessa whether Juarez would have made a specific, profanity-laced comment to a staff member in TYC. Juarez's counsel objected to "improper impeachment. You just can't start picking up records from people who haven't testified, who I haven't been able to cross, and start asking her

–13–

about them," and "I don't think with specific instances like that read out of the records with specific quotes like that, that's what I am objecting to." The trial court partially sustained the objection and requested the prosecutor "not to go into exact quotes in asking."

Vanessa then confirmed, in response to the prosecutor's questions, that it was fair to say she did not know how Juarez behaved while he was in TYC. She believed Juarez tried to "be good" after he was released from TYC, but he began taking methamphetamine and "hanging around" with an older group of men. She did not believe that Juarez knew what he was doing.

On cross-examination, Brandi testified that Juarez called her every day while he was in TYC and "told her everything." He told her about fights he had been in at TYC and that he had to defend himself. Brandi admitted the burglary of Blackwell's house, the robbery at the 7-Eleven, and the thefts that Juarez committed after he was released from TYC did not involve defending himself.

On redirect, Brandi confirmed that her belief Juarez was defending himself was directed toward his conduct while he was in TYC. The prosecutor then read a quote of a comment made by Juarez to a staff member in TYC and asked whether that statement sounded like Juarez was defending himself. The trial court overruled Juarez's counsel's objection to improper impeachment. The prosecutor then read, without objection, a quote of another statement made by Juarez while he was in TYC, and asked if Juarez had told Brandi about that comment. Brandi confirmed that she had not heard about it before.

*Analysis*

A witness who testifies to a defendant's good character may be cross-examined to test the witness's awareness of relevant "specific instances of conduct." *Wilson v. State*, 71 S.W.3d 346,

–14–

350 (Tex. Crim. App. 2002) (citing TEX. R. EVID. 405(a)).[7] Character may be proved through either opinion or reputation testimony. *Id.* "When a witness presents a picture that the defendant is not the type of person to commit the charged offense, the prosecution may impeach that witness'[s] testimony by cross-examining the witness concerning similar extraneous acts." *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002). However, the incidents inquired about must be relevant to the character traits at issue and must have a basis in fact. *Wilson*, 71 S.W.3d at 351.

When Vanessa and Brandi testified that Juarez was a good person who would not have committed crimes absent the outside influence of either his brother or other older men, they were testifying to Juarez's good character. *See Burke v. State*, 371 S.W.3d 252, 261 (Tex. App.— Houston [1st Dist.] 2011, pet. dism'd). Therefore, it was permissible for the State to cross-examine them concerning their awareness of relevant specific instances of Juarez's conduct. *See* TEX. R. EVID. 405(a); *Wilson*, 71 S.W.3d at 350; *Burke*, 371 S.W.3d at 261.

Juarez first complains that questioning Vanessa and Brandi about specific statements attributed to Juarez by TYC staff went beyond what is permitted by "have you heard" or "did you know" questions because the "prosecutor was trying to impeach general statements from Appellant's siblings with specific acts of misconduct, and the use of specific language, about which neither of them were familiar." In Vanessa's and Brandi's opinions, Juarez was a fundamentally good person who would not have committed crimes absent the influence of his brother and other older men. However, the statements attributed to Juarez were made when he

---

[7] Texas Rule of Evidence 405(a) provides:

> In all cases in which evidence of a person's character or character trait is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. In a criminal case, to be qualified to testify at the guilt stage of trial concerning the character or character trait of an accused, a witness must have been familiar with the reputation, or with the underlying facts or information upon which the opinion is based, prior to the day of the offense. In all cases where testimony is admitted under this rule, on cross-examination inquiry is allowable into relevant specific instances of conduct.

TEX. R. EVID. 405(a).

was in TYC and not when he was spending his time with older men. Accordingly, the statements challenged the character evidence offered by Vanessa and Brandi. *See Wilson*, 71 S.W.3d at 350.[8] We conclude the trial court's ruling permitting the State to question Juarez's sisters about their knowledge of the alleged extraneous bad acts was within its discretion.

Juarez also complains that the use of statements contained in a document that was not introduced into evidence violated his right to confront the witnesses against him. The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. An accused's right to confront the witnesses against him is violated by the admission of a hearsay statement made by a nontestifying declarant if the statement was testimonial and the accused lacked a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). However, the Confrontation Clause is not implicated when the use of the evidence is for impeachment because the function of the Confrontation Clause is to prohibit the use of out-of-court testimonial statements introduced to establish the truth of the matter asserted. *Del Carmen Hernandez v. State*, 273 S.W.3d 685, 687–89 (Tex. Crim. App. 2008); *see also Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010) ("[A]n out-of-court statement, even one that falls within [the] definition of 'testimonial' statements, is not objectionable under the Confrontation Clause to the extent that it is offered for some evidentiary purpose other than the truth of the matter asserted.").

The purpose of permitting cross-examination of a character witness through "have you heard" or "do you know" questions is not to discredit the person whose character is in issue, but

---

[8] Juarez has not challenged on appeal the factual basis for the complained-about statements. The court of criminal appeals indicated in *Wilson* that a punishment-phase character witness's awareness of specific instances of conduct may be tested on cross-examination but, before the questions are asked, the foundation for inquiring into the specific instances of conduct should be laid outside the jury's presence so that the trial court will have an opportunity to rule on the propriety of asking them. The *Wilson* court noted, however, that "not only was the State not required to prove to the jury that the acts actually occurred, but it would have been improper for the State to attempt to do so." *Wilson*, 71 S.W.3d at 351 (quoting commentary to Federal Rule of Evidence 405).

rather to discredit the testimony of the character witness. *Harrison v. State*, 241 S.W.3d 23, 25 (Tex. Crim. App. 2007). Because the complained-about statements were offered only to impeach Vanessa's and Brandi's opinion of Juarez's character, the Confrontation Clause is not implicated. *See Del Carmen Hernandez*, 273 S.W.3d at 687–89. We resolve Juarez's third point of error against him.

## Costs

In his fourth point of error, Juarez requests we reform the trial court's judgment to delete the requirement that he pay court costs because the clerk's record does not contain a bill of costs. If a criminal action is appealed, "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is . . . appealed." TEX. CODE CRIM. PROC. ANN. art. 103.006 (West. 2006). Costs may not be collected from the person charged with the costs until a written bill, containing the items of cost, is produced and signed by the officer who charged the cost or the officer entitled to receive payment for the cost. *Id.* art. 103.001.

The clerk's record in this case did not contain a copy of the bill of costs and Juarez's designation of record on appeal did not request that a copy of the bill of costs be included in the record. In light of Juarez's specific complaint that the clerk's record did not contain a bill of costs, we ordered the Dallas County District Clerk to file a supplemental clerk's record containing the certified bill of costs associated with this case, and the clerk did so. *See* TEX. R. APP. P. 34.5(c)(1) (rules of appellate procedure allow supplementation of clerk's record if relevant item has been omitted). Juarez's complaint that the evidence is insufficient to support the imposition of costs because the clerk's record did not contain a bill of costs is now moot. *See Coronel v. State*, No. 05-12-00493-CR, 2013 WL 3874446, at *4 (Tex. App.—Dallas July 29,

–17–

2013, no pet. h.) (citing *Franklin v. State*, No. 05-12-00530-CR, 2013 WL 2446283, at *1 (Tex. App.—Dallas June 4, 2013, no pet. h.)).  We resolve Juarez's fourth point of error against him.

In response to the Court's order requiring supplementation of the record, Juarez filed two motions in which he objects that the bill of costs in the supplemental clerk's record is not a "proper bill of costs" and the bill of costs was not filed in the trial court or brought to the trial court's attention before costs were entered in the judgment.

With respect to his first objection, Juarez argues the bill of costs in the record is not a "proper bill of costs" because it is an "unsigned, unsworn computer printout."  The code of criminal procedure requires only that a bill of cost be certified and signed "by the officer who charged the costs or the officer who is entitled to receive payment for the cost," "stating the costs that have accrued" if the cause is appealed.  TEX. CODE CRIM. PROC. ANN. art. 103.001., .006. Here, the district clerk provided a "Bill of Costs Certification" containing the costs that have accrued to date in Juarez's case; it is certified and signed by the district clerk.  We conclude the supplemental record filed by the clerk meets the mandate of the code of criminal procedure.  *See Coronel*, 2013 WL 3874446, at *4.

Juarez also complains that there is no indication the bill of costs was filed in the trial court or brought to the trial court's attention before costs were entered in the judgment. However, there is no requirement that a bill of costs be presented to the trial court at any time before judgment.  *Id*. at *5.  We deny Juarez's motions objecting to the supplemental record.

Finally, we note that in his original brief and his two post-submission objections to the bill of costs, Juarez does not challenge the propriety or legality of the specific costs assessed; therefore, we do not address these matters.

The trial court's judgment is affirmed.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120125F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSHUA JUAREZ, Appellant

No. 05-12-00125-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas,
Trial Court Cause No. F11-00551-X.
Opinion delivered by Justice Fillmore,
Justices O'Neill and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 31st day of July, 2013.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE