

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-12-00704-CR

Charlie **MAYBERRY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 427th District Court, Travis County, Texas
Trial Court No. D-1-DC-12-904036
The Honorable Jim Coronado, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice

Sitting:     Sandee Bryan Marion, Justice
         Rebeca C. Martinez, Justice
         Luz Elena D. Chapa, Justice

Delivered and Filed:  December 18, 2013

AFFIRMED

A jury found appellant, Charlie Mayberry, guilty of capital murder for the killing of Tim Felder during the commission or attempted commission of a robbery. In three issues on appeal, appellant alleges (1) the trial court erred by failing to suppress the video and audio recordings of his statements to police, and (2) his trial counsel rendered ineffective assistance of counsel. We affirm.

## MOTION TO SUPPRESS

In his first two issues, appellant contends the trial court erred by failing to suppress the audio and video recordings of his statements to police after he unambiguously asserted his right to remain silent. The State responds that appellant's invocation of his right to remain silent was ambiguous.

### A.  Standard of Review

A trial court's ruling at a suppression hearing is reviewed for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). An appellate court must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We do not engage in our own factual review; instead, we determine only whether the record supports the trial court's ruling. *Rocha v. State*, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000). The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos*, 245 S.W.3d at 418.

### B.  Analysis

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. This guarantee is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). Before questioning, law enforcement officials must inform a person in custody that he has the right to remain silent and that any statement he makes may be used against him in court. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "If the individual [in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id*. at 473–74. No specific word or phrase is required to invoke this right. *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). However, an interrogating officer is not required to stop questioning unless the invocation is unambiguous, and

the officer may, but is not required to, clarify an ambiguous response. *See Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). We consider the totality of the circumstances when determining whether the right to remain silent was unambiguously invoked. *Williams v. State*, 257 S.W.3d 426, 433 (Tex. App.—Austin 2008, pet. ref'd). If a person in custody invokes his Fifth Amendment right to remain silent, the admissibility of statements obtained after the invocation depends on whether the person's right was "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

On appeal, appellant contends during the interrogation, he unambiguously invoked his right to remain silent.[1] During the recording, the interrogating officer and appellant can be heard discussing potential outcomes if appellant is found guilty of capital murder. At approximately thirty-eight minutes into the recording, the following exchange between the interrogating officer and appellant takes place:

A: (appellant): I'm going to die anyway. Even if it's not on death row, it's life. Anyway it goes, I'm going to die.

Q: (officer): What do you mean?

A: I'm gone. This is it. That was the last time for me to be out there in the free world. That's it.

Q: I won't pretend to tell you what's going to happen. I can't promise you anything.

A: Can we just go ahead and do what we've got to do?

Q: How about this, why don't we just start from the beginning? How, how did this all come about?

A: *I don't want to talk about this no more*. [emphasis added]

Q: You don't want to talk about this anymore?

---

[1] Over appellant's objection, the trial court determined appellant was properly given *Miranda* warnings prior to the interrogation. This is not an issue on appeal.

A: What's done is done. It's over with. I made a mistake. I might didn't know what I was doing at the time.

Q: That's what I want to know, how did this all come to be?

Appellant argues his statement—"I don't want to talk about this no more"—was a clear and unambiguous invocation of his right to remain silent. The State argues appellant's statement was ambiguous based on its language and the surrounding circumstances. In support of its position that appellant's statement was ambiguous, the State cites *Kupferer v. State*. In that case, Kupferer was taken to police headquarters where a videotaped interview was conducted. *Kupferer v. State*, 408 S.W.3d 485, 487 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). At the beginning of the interview, Kupferer was advised of his *Miranda* rights. *Id*. When asked if he wanted to tell the interrogating officer what happened last night, Kupferer responded: "To tell you the truth, I really don't want to talk about it, but I mean . . . ." *Id*. The court determined Kupferer's statement—"I really don't want to talk about it"—was not a clear and unambiguous refusal to speak with the interrogating officer. *Id*. at 490. The court further concluded the words "'but I mean' were added to qualify that statement" and "Kupferer clearly signaled indecision or ambivalence toward waiving his rights, but he did not unambiguously express a desire to remain silent." *Id*. Here, appellant's request to terminate the interview can be distinguished from Kupferer's statement because appellant's request was a clear and declaratory statement indicating his desire to invoke his right to "cut off questioning," and did not contain such indecision or ambivalence toward waiving his rights. *See Mosley*, 423 U.S. at 103 ("The critical safeguard identified in [*Miranda*] . . . is a person's right to cut off questioning."). Nor did appellant's invocation contain a qualifying statement as in *Kupferer*.

The State also argues appellant's statements are akin to the statements made in *Ramos v. State*. In that case, Ramos moved to suppress statements made to police shortly after he was taken

into custody. *Ramos*, 245 S.W.3d at 411. The trial court held an evidentiary hearing where the interrogating officer testified that after he informed Ramos his girlfriend had identified him as the shooter, Ramos became upset and told the interrogating officer: "I don't want to talk to you. I don't want to talk about it anymore." *Id.* at 415–16. On appeal, a majority of this court concluded Ramos did not unambiguously invoke his right to remain silent because the word "it" was ambiguous, as it was open to more than one reasonable interpretation. *Id.* at 417. The Court of Criminal Appeals reversed, holding Ramos' statement that he did not "want to talk to you [the interrogating officer]," was "an unambiguous, unequivocal, and unqualified assertion of his right to remain silent." *Id.* at 418–19. The Court further concluded "[a]ny ambiguity in [Ramos'] other statement to [the interrogating officer], that he did not want to talk about 'it' anymore, was, in context, entirely irrelevant." *Id.* at 419.

The State contends *Ramos* stands for the proposition that when a person, in custody and being questioned by police, states he does not want to talk about "it" anymore, use of the word "it" renders the request ambiguous. We do not believe *Ramos* supports the State's contention that use of a pronoun when a person in custody tells an interrogating officer that he no longer wants to speak, changes an unambiguous invocation of the right to remain silent into an ambiguous one. Prior to this point in the interrogation, appellant freely discussed the circumstances surrounding the shooting with the interrogating officer. The focus of the interrogation was clearly about the shooting that killed Felder. A reasonable interrogating officer would not have found appellant's statement ambiguous because the shooting constituted the only reason for appellant's interrogation. Considering the totality of the circumstances, we believe appellant's statement—"I don't want to talk about this no more"—was an unambiguous invocation of his right to remain silent.

Because appellant unambiguously invoked his right to remain silent, we next inquire whether this right was "scrupulously honored." *See Mosley*, 423 U.S. at 103–04. The right to remain silent does not create "a per se proscription of indefinite duration" against further questioning. *Id*. at 102–03. Rather, "police must 'scrupulously honor' the defendant's right to remain silent by (1) immediate cessation of questioning; (2) resumption of questioning only after the passage of a significant period of time; (3) provision of a fresh set of *Miranda* warnings; and (4) restrictions of the second interrogation to a crime that was not a subject of the earlier interrogation." *Watson*, 762 S.W.2d at 596–97. There must also be an end to the questioning sufficient to indicate that the police respected the suspect's request. *See Mayes v. State*, 8 S.W.3d 354, 358 (Tex. App.—Amarillo 1999, no pet.). "The 'scrupulously honored' test is not met where the police . . . resumed questioning after a short interval during which custody continued." *Ramos*, 245 S.W.3d at 419 (internal citation omitted). Here, there was no immediate cessation of questioning; instead, the interrogating officer immediately resumed questioning. Although appellant was informed of his right to remain silent prior to initial questioning, he was not provided a fresh set of *Miranda* rights after invoking his right. On this record, we conclude appellant's right to remain silent was not "scrupulously honored." However, this does not end our review.

We must next review the record to determine if the error was harmless. We will reverse a conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (discussing constitutional error analysis). Prior to invoking his right to remain silent, appellant spoke freely with the interrogating officer for approximately thirty-eight minutes. During this time, appellant gave several explanations for his whereabouts and activities on the night Felder was shot. First, appellant admitted only to being at the house where Felder was shot earlier in the day, and denied any involvement in the shooting, claiming he was at a

downtown Austin club, then "went home with two strippers" thereafter. Appellant then acknowledged he was involved in the shooting, but claimed he was threatened into participating in a robbery by two individuals named T.J. and "Blindside," and although he was armed, shot only into the air. Next, appellant admitted he shot Felder, but claimed the gun went off accidentally when appellant was threatened by one of his accomplices. Appellant then claimed he intended to shoot the television and accidentally shot Felder. Finally, appellant admitted he intentionally shot Felder because he thought Felder had a gun. All of these statements occurred prior to appellant invoking his right to remain silent. After invoking his right to remain silent, appellant indicated he intended to rob Felder, but "didn't mean to shoot the guy."

In addition to appellant's statements to police prior to invoking his right to remain silent, the jury also heard the testimony of Jackie Powell, an eyewitness to the shooting. Powell testified he was staying at the house where Felder was shot on the night of the shooting, and that he was speaking with Felder when an individual known as Blindside knocked at the front door and asked to use the bathroom. After using the bathroom, Blindside left the house and approximately thirty seconds later, appellant knocked at the front door and also asked to use the bathroom. When appellant emerged from the bathroom, he was holding a rifle Powell described as an AK-47. Appellant stood above Felder pointing the rifle downward toward Felder as Powell sat a few feet away. Powell testified appellant told Felder to "drop out," indicating appellant was robbing Felder. Powell further testified Felder was not complying quickly enough with appellant's demand for money. Powell then witnessed appellant tell Felder, "you're pissing me off" shortly before shooting Felder and fleeing in a gray SUV.

The jury also heard the testimony of appellant's accomplice, Donald "Blindside" Vilo. Vilo testified appellant called and told Vilo he "had a lick," indicating appellant was planning to commit a robbery. Vilo testified appellant offered him a portion of the proceeds from the robbery

if Vilo would pick appellant up in his car and drive him to and from the robbery. Vilo agreed to do so and testified that appellant carried a rifle Vilo described as an AK-47, concealed under his jacket when Vilo picked appellant up. Vilo admitted to using the bathroom at the house where Felder was shot and confirmed to appellant that the person appellant planned to rob was inside the house. As he waited in the vehicle described by Powell, Vilo testified he heard a gunshot then saw appellant running toward the vehicle. When he entered the vehicle, Vilo testified appellant said he "shot some guy because he was going for a gun."

Finally, the jury heard testimony regarding the physical evidence and the medical examiner's results. The crime scene supervisor testified a bullet fragment and shell casing had been recovered. The firearms and tool mark examiner testified his analysis of the fragment and casing indicated the bullet was a 7.62 caliber round, which is consistent with the type of firearm appellant was seen with by both Powell and Vilo. The medical examiner testified Felder suffered three wounds consistent with a gunshot. The first wound was in Felder's upper-right chest, the second was in his lower-left abdomen, and the third was in his left forearm. The medical examiner presented a diagram that tracked the trajectory of the bullet. The diagram showed that the bullet entered through Felder's chest; damaged his right lung, diaphragm, and liver; exited through his lower-left abdomen; then struck his left forearm as it exited his abdomen. The bullet's trajectory was consistent with Powell's description of how appellant stood over Felder before shooting him. The medical examiner also testified that Felder's death was caused by the gunshot wound and ruled his death a homicide.

Based upon appellant's statements prior to invoking his right to remain silent, Powell's eyewitness testimony, Vilo's corroborated accomplice testimony, as well as the physical evidence and the medical examiner's testimony, we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, appellant contends he received ineffective assistance of counsel during the guilt-innocence phase of his trial.

### A. Standard of Review

To prevail on an ineffective assistance claim, an appellant must prove (1) counsel's representation fell below the objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A reasonable probability is sufficient to undermine confidence in the outcome of the proceedings. *Mofatt v. State*, 930 S.W.2d 823, 826 (Tex. App.—Corpus Christi 1996, no pet.). When considering an ineffective assistance claim, there is a strong presumption that counsel's action fell within the wide range of reasonable professional behavior and was motivated by sound trial strategy. *Strickland*, 466 U.S. at 689; *Thompson*, 9 S.W.3d at 813. To overcome this presumption, a claim of ineffective assistance must be firmly demonstrated in the record. *Thompson*, 9 S.W.3d at 814. In most cases, direct appeal is an inadequate vehicle for raising such a claim because the record is generally undeveloped and cannot adequately reflect the motives behind trial counsel's actions. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *Thompson*, 9 S.W.3d at 813–14. When the record is silent regarding trial counsel's strategy, we will not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it," *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005), or "if any reasonably sound strategic motivation can be imagined." *Kuhn v. State*, 393 S.W.3d 519, 538 (Tex. App.—Austin 2013, pet. ref'd).

**B. Analysis**

Appellant argues his trial counsel rendered ineffective assistance of counsel by failing to object to the testimony of the State's psychiatric witness, Dr. Maureen Burrows. Specifically, appellant complains Dr. Burrows testified to "extremely damaging extraneous acts of appellant . . . without objection from appellant's trial counsel," including jail notes that referenced (1) appellant threatened other inmates, (2) appellant hoarded Seroquel, (3) appellant threatened jail staff, and (4) appellant was manipulative and had a personality disorder. Appellant contends there was no strategic reason for allowing such testimony, and trial counsel's failure to object to the inadmissible testimony was so egregious that no competent attorney would have done so.

Dr. Burrows testified she evaluated appellant and determined he was competent to stand trial. A review of the record shows appellant's trial counsel objected several times during Dr. Burrows' testimony, including multiple objections to references Dr. Burrows made to appellant's incarceration, even requesting outside the presence of the jury that Dr. Burrows be instructed not to mention appellant's incarceration. Additionally, trial counsel's first question to Dr. Burrows on cross-examination was related to hypoxia's effect on mental capacity, which appears to have been elicited in order to introduce the fact that appellant was choked as a child, and as a result, suffered diminished cognitive abilities. We believe the complained of testimony could have been solicited for strategic reasons. We conclude appellant has not presented sufficient evidence to rebut the presumption that such strategy fell below the wide range of reasonable professional behavior. As a result, appellant has not met the first prong of *Strickland*.

**CONCLUSION**

We conclude the trial court's error denying appellant's motion to suppress was harmless, and appellant has not established ineffective assistance of counsel.  Therefore, we affirm the trial court's judgment.

Sandee Bryan Marion, Justice

Do not publish